[Crim. No. 42990. Second Dist., Div. Five. Apr. 25, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM BLOOM, Defendant and Appellant.

## COUNSEL

Edward J. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Pamela P. Cvitan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HASTINGS, J.—This case arose as the result of a two-car collision in which appellant, the driver of one car, was injured and Carrie Lee, the driver of the other car, was killed. In an information filed by the Los Angeles County District Attorney, appellant was charged in count I with driving while under the influence of alcohol and in so doing causing bodily injury and death to Carrie Lee (Veh. Code, § 23101, now § 23153), and in count II with vehicular manslaughter (Pen. Code, § 192, subd. 3(a)). Appellant's motion to suppress evidence (Pen. Code, § 1538.5) was denied. After a jury trial, appellant was found guilty on both counts. He was sentenced to state prison for the upper term of three years on each count, the sentences to run concurrently. The sentence on count I was stayed (Pen. Code, § 654). On appeal, he contends:

(1) The trial court erroneously denied the motion to suppress blood sample test results;

(2) The trial court erroneously refused certain jury instructions requested by the defense, thereby denying appellant his right to a fair trial;

(3) The probation report was based upon second-hand, and not "accurate and reliable" information; and

(4) The trial court misapplied California Rules of Court, rule 421(a)(3), in imposing the upper term, because the victim was not "particularly vulnerable."

## FACTS

On June 15, 1980, at approximately 6 p.m., appellant, driving a blue Chevy Vega, was traveling west on Foothill Boulevard in Sunland, on the way to pick up his wife at her place of employment in Van Nuys. Carrie Lee, driving a brown Ford Pinto station wagon, was going eastbound on Foothill, on her way home from work. Greg Dinsmore, who was riding in the back of a Toyota pickup also westbound on Foothill, saw appellant's car traveling at approximately 50 miles per hour, whereas the rest of the traffic was going about 35 miles per hour.[1] Appellant was traveling in the curb lane but swerved into the center lane to avoid a rear-end collision with the car in front of him. He went partially over the center divider strip (marked with yellow lines), swerved back into the center lane, and then swerved again over the center line and into the eastbound lane, striking Carrie Lee's vehicle head-on. According to Kenneth Thurman, who had been following appellant westbound on Foothill, appellant "completely lost total control of his car." According to Dinsmore, Lee tried to avoid the collision but was unable to do so. This was corroborated by the testimony of Los Angeles Police Officer Michael Ogne, who stated that Lee's car left 20 feet of front wheel skid (resulting from locked wheels). There were no skid marks from appellant's vehicle.

Los Angeles Fire Department paramedics responded to the accident. One of the paramedics, Alan Bush, testified that while the paramedics were removing appellant from his vehicle, appellant emitted a strong odor of alcohol. To protect appellant in case of cervical injuries, they placed appellant on a "back board" and placed a cervical collar around his neck. While in the paramedic ambulance, appellant sat up on the board, removed the cerv-

---

[1]Michael LePeilbet, an off-duty county marshal who was following Carrie Lee, testified that she was going approximately 30 miles per hour.

ical collar, and began to yell abusive language at the paramedics. He also tried to punch the paramedics several times. There was a strong odor of alcohol from appellant's mouth every time he spoke.

Appellant and Carrie Lee were transported to Pacoima Memorial Hospital in the same ambulance. Lee's vital signs were poor and she was on a life support system while being transported.

Los Angeles Police Officer Carl Helm entered the room where appellant was being treated at the hospital. Appellant smelled strongly of alcohol,[2] and was also being loud, boisterous, and obnoxious. In Helm's opinion, appellant was definitely under the influence of alcohol. He told appellant that he was placing him under arrest and requested a blood sample. According to Helm, appellant said, "Sure, I'll give you a blood sample." The sample was taken by Dr. Andrew Kochan and tested by David Margolis, a chemist with the Los Angeles Police Department. The test result showed that appellant's blood alcohol content was .31, more than three times the amount required to invoke the presumption of intoxication under California law (former Veh. Code, § 23126, subd. (a)(3) now § 23155, subd. (a)(3)).[3]

Appellant was transported by police car from Pacoima Memorial Hospital to County USC Medical Center. Carrie Lee never regained consciousness and died after lying in a coma for 21 days.

DEFENSE

Appellant testified in his own defense, and denied being under the influence of alcohol at the time of the accident. Appellant stated that June 18th was his day off and, after working on his truck in the morning, he had gone to the Cubby Hole, a beer bar, around 3 p.m. to eat lunch and shoot pool. He ate a burrito and consumed four 12-ounce bottles of beer between 3 and 6 p.m.[4] This was confirmed by Walter Culverhouse, part-owner of the Cubby Hole, who was the bartender on duty that afternoon.

Appellant's version of the accident was as follows: As he was proceeding westbound on Foothill Boulevard at about 40 miles per hour, the car in

---

[2]Officer R. D. Barnes and nurse Shiela Winn, who examined appellant at the hospital, also testified that appellant emitted a strong odor of alcohol.

[3]Effective February 18, 1982, it is now "unlawful for any person who has 0.10 percent, or more, by weight, of alcohol in his or her blood to drive a vehicle." (Veh. Code, § 23152, subd. (b).)

[4]Responding to a hypothetical question, a police department chemist testified that for an individual of appellant's size and weight, four bottles of beer over a two- or three-hour period would produce a blood alcohol content of 0.08 percent.

front of him slowed abruptly and appellant had to swerve into the center lane to avoid a rear-end collision. In doing so, he went slightly over the yellow line but returned immediately to the center lane. He turned his head sharply to look at the car he had just passed and his pipe came out of his mouth and landed on the seat. His pipe threw out some hot coals and he reached over to brush them off the seat so it would not catch fire. He looked up, saw a car in front of him, and cranked the wheel hard to the right. The next thing he knew, he was in the paramedic ambulance.

Appellant admitted that he had been unpleasant with the paramedics, but said that his face hurt and he did not want them to touch it.

With respect to the blood sample, appellant denied giving permission for a blood sample and did not recall anyone drawing blood from his arm.

## DISCUSSION

1. *Motion to Suppress.* Appellant contends that his motion to suppress the results of his blood test was erroneously denied because (1) he testified that he did not consent to the taking of the blood sample, (2) even assuming that he did give his consent, the People did not show that such consent was freely and voluntarily given, and (3) he was not advised of his right to choose among three types of tests (breath, blood or urine) as required under Vehicle Code section 13353.

The question of consent arose by virtue of a conflict in the testimony between appellant and Officer Helms, which conflict was resolved by the trial court in favor of the officer. ■ The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. Under the well-established principles of appellate review, all presumptions favor proper exercise of that power and the court's finding must be upheld if, as here, it is supported by substantial evidence. (*People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

■ Further, admission of the blood sample into evidence would have been proper even without the court's finding of express consent, since the taking of the blood sample was permissible under California's "implied consent" law.[5] In *People v. Superior Court (Hawkins)* (1972) 6 Cal.3d 757

---

[5]Vehicle Code section 13353, subdivision (a)(1) provides in pertinent part: "Any person who drives a motor vehicle shall be deemed to have given his or her consent to a chemical test of his or her blood, breath, or urine for the purpose of determining the alcoholic content of his or her blood if lawfully arrested for any offense allegedly committed in violation of Section 23152 or 23153. The test shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe the person was driving a motor vehicle in violation of Section 23152 or 23153."

[100 Cal.Rptr. 281, 493 P.2d 1145], the case upon which the trial court based its ruling denying the suppression motion, the Supreme Court stated: "It is clear that the Fourth Amendment does not bar a compulsory seizure, without a warrant, of a person's blood for the purposes of a blood alcohol test to determine intoxication, provided that the taking of the sample is done in a medically approved manner, is incident to a lawful arrest, and is based upon the reasonable belief that the person is intoxicated." (6 Cal.3d at p. 761.)

The court went on to discuss the legislative intent behind California's "implied consent" law: "Although it is clear under *Schmerber* [*Schmerber* v. *California,* 384 U.S. 757 (16 L.Ed.2d 908, 86 S.Ct. 1826)] that a person who has been lawfully arrested may have a blood sample forcibly removed without his consent, provided it is done in a reasonable, medically approved manner and provided further that the arresting officer had probable cause to believe the arrestee was intoxicated, nevertheless such an episode remains an unpleasant, undignified and undesirable one.

"However, the shocking number of injuries and deaths on the highways caused by drunk drivers has compelled society to adopt extreme measures in response. . . . It is noteworthy that in [enacting section 13353], the Legislature took pains to condition its use upon a lawful arrest for driving under the influence of intoxicating liquor and upon the reasonable belief of the peace officer that the arrestee was in fact so driving." (*Id.* at pp. 764-765.)

In this case, the three criteria set forth in *Hawkins* were, as the trial court found, clearly met. Appellant was under arrest when the blood sample was taken, Officer Helm having correctly concluded that appellant was under the influence of alcohol, and the sample was taken in a hospital by a physician, in a medically approved manner.

Appellant argues further that the test results should have been suppressed because Officer Helm admittedly did not discuss with him the choice of three possible tests, blood, breath or urine, as required by section 13353. However, this omission does not violate any constitutional right. (*People* v. *Brannon* (1973) 32 Cal.App.3d 971, 975-976 [108 Cal.Rptr. 620]; *People* v. *Ryan* (1981) 116 Cal.App.3d 168, 182 [171 Cal.Rptr. 854].) As stated by the court in *Ryan*: "As pointed out in cases, the immediate purpose of section 13353, the implied consent law, is to obtain the best evidence of blood alcohol content at the time of the arrest of a person who is reasonably believed to be driving while intoxicated. Its ultimate purpose is to inhibit intoxicated persons from driving on the highways. [Citations.] It is also well recognized that, as a matter of public policy, it is desirable to obtain

a sample of one of the tests in a noncoercive fashion thereby substituting volition for compulsion. [Citations.]

"However, the desirability of obtaining blood samples in a noncoercive manner by one of the tests provided for in section 13353 may not be equated with constitutionality." (*Ibid.*)

Since appellant's constitutional rights were not violated by virtue of the failure of Officer Helm to advise him that he had a choice of three kinds of tests,[6] the trial court correctly denied appellant's motion to suppress.

2. *Jury Instructions.* ■ Without any supporting authority or citation to case law, appellant contends that by refusing to give requested defense jury instructions the trial court denied him his right to a fair trial and due process of law.

The defense submitted 11 proposed instructions lettered A through K. During a discussion regarding which instructions would be given to the jury, the court said: "All right, the defense has submitted instructions with counsel, both counsel in chambers. The court will allow defense instructions A, B, C, D, and E. The court will reject and [d]isallow instructions F, G, H, I, J, K, either on the basis it's an improper statement of the law or it's covered by other instructions that the court is giving."

Appellant makes no argument with respect to the refused instructions F, H, I and K, apparently conceding that the court's ruling was correct as to those instructions. However, he claims that the court's refusal to give instructions "G" and "J" was error. We disagree.

The crux of requested instruction "G" was that the defendant need only raise a reasonable doubt to rebut the presumption of "under the influence" created by a chemical test showing of a .10 percent blood alcohol. This merely duplicates CALJIC No. 16.834, given on the court's own motion.[7]

---

[6] With respect to appellant's reliance on *Brown v. Municipal Court* (1978) 86 Cal.App.3d 357 [150 Cal.Rptr. 216], we quote again from *People v. Ryan:* "We observe in passing that appellant's reliance on *Brown v. Municipal Court* . . . is obviously misplaced. *Brown* was not concerned with the issue here presented, . . . but rather with the violation of section 13354, subdivision (b), which authorizes the person tested to obtain an additional test in order to accurately determine the amount of his blood alcohol." (*People v. Ryan, supra,* 115 Cal.App.3d at p. 183.)

[7] CALJIC No. 16.834, as given, then read: "If the evidence establishes beyond a reasonable doubt that the amount, by weight, of alcohol in the defendant's blood was one tenth of one percent (0.10%) or more at the time of the test as shown by a chemical analysis of his blood, you should find that the defendant was under the influence of intoxicating liquor at the time of the alleged offense, *unless from all the evidence you have a reasonable doubt that* he was in fact under the influence of intoxicating liquor at the time of the alleged offense." This instruction has now been withdrawn by the CALJIC committee because of the 1981 amendment of Vehicle Code section 23155 (formerly § 23126), effective January 1, 1982.

The requested instruction "J" purported to address the requirements for a finding of guilt on count I: "If you find as a fact that the defendant was operating a vehicle on a public highway, you must also find as a fact he was driving under the influence of an alcoholic beverage before you can find him guilty of Count I.

"The presumption that defendant was under the influence of alcohol if the results of the analysis of his blood were 0.10% or more, as defined in these instructions, may be overcome if the defendant merely raises a reasonable doubt as to the existence of the presumed fact." The second paragraph of this instruction merely duplicates CALJIC No. 16.834. Further, the instruction was an incomplete statement of the law, as it not only failed to set forth the elements of the crime, but failed to define "under the influence." The correct, and more complete statement of the law is set forth in CALJIC No. 12.60, also given on the court's motion.[8]

The court's refusal to give the requested special instructions did not result in any prejudice to appellant. He was adequately protected by the CALJIC instructions given on the court's own motion, which correctly and completely stated the applicable law.

3. Appellant next contends that the trial court was influenced in its sentencing determination by a probation report which contained "inaccurate prejudicial unreliable second-hand information," specifically: (1) Frank Williams, who was interviewed by the probation officer, heard that on the day of the accident appellant had been offered a ride home from the bar because he was too drunk to drive; (2) Williams also heard that appellant laughed and joked saying that he, appellant, was never going to go to jail

---

[8]CALJIC No. 12.60, as given, then read: "Defendant is charged in Count I of the information, with the commission of the crime of violation of Section 23101 of the Vehicle Code.

"Any person who, while under the influence of intoxicating liquor, drives a vehicle and when so driving does any act forbidden by law or neglects any duty imposed by law in the driving of such vehicle, which act or neglect proximately causes death or bodily injury to any person other than himself, is guilty of the crime of violation of Section 23101 of the Vehicle Code.

"A person is under the influence of intoxicating liquor when as a result of drinking such liquor his physical or mental abilities are impaired so that he no longer has the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence, under the same or similar circumstances.

"A proximate cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred.

"In order to prove the commission of the crime of a violation of Section 23101 of the Vehicle Code, each of the following elements must be proved:

"1. That a person drove a vehicle while under the influence of intoxicating liquor,

"2. That when so driving such person did some act which violated the law or failed to perform some duty required by law, and

"3. That as a proximate result of such violation of law or failure to perform such duty, another person was killed."

because he was going to beat the case; (3) appellant was unemployed; and (4) appellant drinks five or six beers after work, and twelve beers if he knows he is not going out.

■ "[T]he basic evil which should be avoided in probation reports tendered to the court for sentencing purposes is that the reports should not in any way be misleading or inaccurate." (*People* v. *Lutz* (1980) 109 Cal.App.3d 489, 497 [167 Cal.Rptr. 309].) The fact that a probation report contains hearsay is in itself not improper, but fundamental fairness demands that such reports be founded on accurate and reliable information. (*People* v. *Santana* (1982) 134 Cal.App.3d 773 [184 Cal.Rptr. 733].) If the defendant feels the probation report is insufficient or inaccurate, or is based upon unreliable information, he or she may present witnesses to counteract or correct any portion of the report. (*People* v. *Valdivia* (1960) 182 Cal.App.2d 145 [5 Cal.Rptr. 832].)

■ The court indicated that it would not consider any of the statements attributed to Frank Williams unless Williams was available to testify in person. Williams then testified that (1) he had often seen appellant drinking beer at meetings of a CB club which they both attended, and (2) an individual by the name of Pat Poulson told him that appellant was "laughing and joking" and said he would never go to jail because he was going to "beat the case." The court specifically stated that it took Williams' statements in the context in which they were made, that is, "that this is something that Mr. Williams had heard from other than the defendant."

According to the probation report, the source of information with respect to appellant's drinking habits was appellant himself, and not his wife as he claims. Appellant's wife also testified at the probation and sentencing hearing that the statement attributed to appellant in the probation report did not sound like something appellant would say, and that the most appellant would drink would be one or two beers.

With respect to the report's indication that appellant was unemployed, this was an accurate statement of the situation as it existed when the report was made, since appellant was incarcerated at the time. The report certainly does not suggest that appellant was chronically unemployed, and in fact the probation officer set forth appellant's complete employment history including his service with the Marine Corps in Vietnam.

Appellant was afforded an ample opportunity to contradict any statements in the probation report which he felt were inaccurate or misleading. The defense was able to cross-examine Frank Williams about the statements attributed to him in the probation report, and the information with respect

to appellant's drinking habits was contradicted by appellant's wife, who testified for the defense at the probation and sentencing hearing.

Appellant fails to recognize the one factor which most influenced the court in its sentencing determination. In the court's words, this was "the fact that this defendant, knowing that he had taken the life of another person by virtue of his drinking alcohol, still continued to drink alcohol." Thus, the testimony of appellant's wife that when he did drink he had "only one or two beers" was of very little help to appellant.

4. In sentencing appellant to state prison for the upper term, the court cited the following factors in aggravation:

(1) The victim was particularly vulnerable (Cal. Rules of Court, rule 421 (a)(3));[9]

(2) "The defendant had a high blood alcohol reading, indicating that a considerable amount of alcohol was consumed during the day;" and

(3) The defendant had a "complete lack of remorse," evidenced by the fact that "this defendant, knowing that he had taken the life of another person by virtue of his drinking alcohol, still continued to drink alcohol."

■ Appellant contends that there was no evidence to support the court's finding that the victim was "particularly vulnerable" within the meaning of rule 421(a)(3), and therefore the use of this factor was "capricious, and was merely a ploy used to impose an excessive and illegal term." We hold that although this rule was in fact applied incorrectly, there were sufficient factors in aggravation to impose the upper term.

As used in the context of rule 421(a)(3), a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act. An attack upon a vulnerable victim takes something less than intestinal fortitude. In the jargon of football players, it is a cheap shot." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [156 Cal.Rptr. 502].) Rule 421(a)(3) has thus far been applied exclusively in criminal cases involving violent felonies, where the age or physical characteristics of the victim, or

---

[9]Rule 421 lists "Circumstances in Aggravation" which the court is to consider in rendering its choice of sentence. All further references to rules are to the California Rules of Court.

the circumstances under which the crime is committed, make the defendant's act especially contemptible.[10]

There are few individuals as "defenseless, unguarded, unprotected, accessible, assailable and susceptible" as those who have the misfortune of being in the wrong place at the wrong time when a drunk driver takes to the road. All victims of drunk drivers are "vulnerable victims," but it is precisely because they are *all* vulnerable that Carrie Lee cannot be considered to be vulnerable "in a special or unusual degree, to an extent greater than in other cases." (*People* v. *Smith, supra,* 94 Cal.App.3d at p. 436.) While we can visualize extraordinary situations in which a drunk driving victim might be considered to be "particularly vulnerable," such a situation is not present here, and therefore the court erred in applying rule 421(a)(3) to this case.

This error is not prejudicial, however, since the court stated two other reasons besides the above for selecting the upper term: (1) appellant's astonishingly high blood alcohol level, and (2) the fact that appellant continued to drink alcohol despite the fact that drinking alcohol had caused him to take the life of another human being.[11] Although these are not among the criteri a set forth in rule 421, rule 408 makes it clear that the factors listed in rule 421 are not exclusive and the sentencing judge may consider other criteria "reasonably related to the decision being made." (*People* v. *Wilson* (1982) 135 Cal.App.3d 343, 355 [185 Cal.Rptr. 498].) The factors in aggravation stated by the court here met this requirement. The sentence imposed was appropriate and well-deserved.

The judgment of conviction is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied May 11, 1983.

---

[10]In *Smith,* for example, the defendant and a companion, both AWOL Marines, decided to burglarize an elderly man and followed him from a restaurant to his apartment. They broke into the wrong apartment, however, and found two women sleeping. Seizing the moment, they proceeded, over a four-hour period, to sexually harass and abuse the two victims and a third woman resident who arrived later. Smith used a knife during this series of events. In responding to Smith's argument that the words "particularly vulnerable" were unconstitutionally vague, the court stated: "Having demonstrated their proclivity for victimizing the susceptible when they first determined to roll an old man, then to burgle him, these two armed marines climbed on top of two sleeping women in the middle of the night without any warning. Smith and his confederate exploited the very vulnerability Smith finds difficult to discern." (94 Cal.App.3d at p. 435.)

[11]The court, after remarking that it was limited to the upper term by the constraints of the determinate sentencing law, concluded by telling appellant that "getting behind that wheel with a .31 and taking the life of a girl is just the same as if you had taken a gun or any other weapon and imposed that upon another human being."