Filed 7/2/15  P. v. Dixon CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B255903 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA092258) |
| v. | |
| JEFFERY LEE DIXON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Arthur H. Jean, Jr., Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jason C. Tran and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury rejected defendant and appellant Jeffery Lee Dixon's heat of passion, self-defense and imperfect self-defense claims and found him guilty of second degree murder, with a finding that he personally used a deadly weapon — a belt and an electrical cord — to cause the victim's death. (Pen. Code, §§ 187, subd. (a); 12022, subd. (b)(1).)[1] The trial court found Dixon had two prior strike convictions, a prior serious felony conviction, and two prior convictions with a prison term. (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d); 667, subd. (a)(1); and 667.5, subd. (b).) The trial court sentenced Dixon to serve a total aggregate term in state prison of 51 years to life. We affirm.

## FACTS

*The Discovery of the Victim's Body*

On May 1, 2012, Long Beach Police Department (LBPD) officers responded to a triplex residential building on Ellis Street in Long Beach after an anonymous 9-1-1 call. Dixon lived in one of the apartments at the property. A Chrysler PT Cruiser registered to Monique Burton was parked near the property. Over the course of ensuing events, LBPD Detective Mark McGuire obtained a search warrant, and officers broke through the front door of Dixon's apartment.

Inside the apartment the officers found the body of a deceased woman, later identified as Burton.[2] Officers also found a set of car keys and a disassembled cell phone on the kitchen counter. There were cleaning products and construction tools in the kitchen. There was also a broken dinner tray, blood evidence, blood-stained clothing in two trash bags, a broken belt, and a broken electrical cord inside the apartment. Dixon was not present at that scene.

---

[1]    All further undesignated section references are to the Penal Code.

[2]    An autopsy revealed that Burton died by strangulation. Injuries to her face and neck were consistent with being strangled while faced down on the floor and someone being on her back pulling the strangulation device upward. Burton also had secondary blunt force trauma injuries to her head that contributed to her death.

2

In a small garage just outside Dixon's apartment, officers discovered a three-foot wide by five-foot deep hole. There was a ladder in the hole and a shovel nearby.

***Dixon's Arrest and Interview Statements***

On May 2, 2012, Los Angeles Police Department (LAPD) officers arrested Dixon as he was walking out of his sister's residence in Compton. As LAPD Detective Jacinto Ponce was handcuffing Dixon, he spontaneously stated, "It is me. I am the guy you are looking for. I knew Long Beach PD was looking for me." Detective Ponce did not ask Dixon any questions or respond back in any way; he "just let [Dixon] talk." As Detective Ponce walked Dixon to a police van, Dixon volunteered, "I killed her." A moment later, after the detective and Dixon were sitting in the police van, Dixon volunteered still more, saying, "My family had nothing to do with it. It was only me. It was all me."

LBPD Detective McGuire interviewed Dixon following his arrest. Recordings of the interviews were played for the jury. Dixon stated he met Burton while he was living in Wilmington. During their relationship, Burton falsely accused him of raping her. Dixon tried to get away from Burton by moving to Long Beach, but she found his address. They continued a sexual relationship.

Dixon stated that Burton came to his apartment to get money on Monday night, April 30, 2012, and she was acting "like a ravin' beast." They began arguing, and Burton punched Dixon in the mouth and hit him in the head with a wooden dinner tray. Dixon hit Burton back; he stated he may have hit her with a stick that had broken off of the dinner tray. Burton threatened to call the police because Dixon was a "third-strike offender." At that point, "all [Dixon] was thinkin' about was the three strikes." He became enraged, and hit Burton with a folded chair, knocking her unconscious. While Burton was "out," Dixon strangled her with his belt, twisting the belt with a stick. He also used an extension cord to strangle Burton. Dixon stated he wanted to make "sure" Burton was dead because he was worried about his third strike. Dixon said he did not plan to kill Burton before she came to his apartment.

After he killed Burton, Dixon cleaned up her blood with bleach and water. He covered her body with a sheet and disassembled her cell phone. He then dug a hole in the garage where he intended to bury her body, and covered the hole with cement.

***The Criminal Case***

In October 2012, the People filed an information charging Dixon with murder. The case was tried to a jury in March 2014 at which time the prosecution presented evidence establishing the facts summarized above. Dixon testified in his own defense. He testified about threats and false accusations from Burton. He admitted that he hit Burton, but said he had done so in self-defense. He claimed that he killed her after his self-defense went out of control. The trial court instructed the jury on first and second degree murder and voluntary manslaughter based on theories of heat of passion and imperfect self-defense.

On March 27, 2014, the jury returned a verdict finding Dixon guilty of murder, and finding the murder was committed in the second degree rather than the first degree. Further, the verdict included a finding that Dixon personally used a deadly weapon, a belt and electronic cord, which caused Burton's death.

Dixon filed a timely notice of appeal.

## DISCUSSION

### I. The Trial Court Did Not Err In Instructing the Jurors

During defense counsel's closing argument to the jury, the prosecutor objected at two separate points when defense counsel urged the jurors to "walk in [Dixon's] shoes" and "walk his path." In both instances, the trial court sustained the prosecutor's objections to the statements. On appeal, Dixon argues the trial court's admonitions during argument constituted prejudicial instructional error requiring the reversal of his murder conviction. We disagree.

Fairly early during defense counsel's closing argument, the following exchange occurred:

"[DEFENSE COUNSEL]: The prosecution made a big deal that he intended to kill her. Yes, we know that. That's a fact. He admitted that

4

from day one. In fact, he told his sister . . . oh my God, I can't believe I killed a woman. I have to go on the run. She attacked me. She beat me. She was harassing me. And I fought back and I lost it. He told that to his sister before the police were involved and was frantic and panicked and running around and driving all night . . .

"This was definitely done in the heat of passion, definitely began in self-defense regardless of whether or not you feel he took it too far and acted unreasonably and, God forbid, that any one of use ever has to walk in his shoes.

"[PROSECUTOR]: Objection, Your Honor.

"THE COURT: Sustained. You can't impose your own personal life probability in this. You can use your life experiences but this is not about you. It is about the case."

Later, near the end of defense counsel's closing argument, the following exchange occurred :

"[DEFENSE COUNSEL]: If you think his actions were unreasonable but he was defending himself, lost control, heat of passion, took it too far, point of no return, and you have reasonable doubt and you are not sure, and you are weighing them, could this be murder? Could this be manslaughter? If you have a reasonable doubt, you must give him the benefit of the doubt.

"That's what the law says. You must find him guilty of manslaughter only. He was defending himself. He lost it. There is nothing to contradict that. In your deliberations you must put yourself in his shoes. You have to walk in his path.

"[PROSECUTOR]: Your Honor, objection.

"THE COURT: I don't think so. This is not a personal thing. You are acting as judges. And so conduct yourself that way. Thank you. The objection is sustained."

We find no error occurred in Dixon's case because the trial court's instructions during defense counsel's closing argument did not communicate any incorrect statement of law. Dixon is correct that an element of objective reasonableness was involved in his case as to his self-defense claim (see, e.g., *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083); that an element of actual subjective belief in the need to defend himself was also an issue for imperfect self-defense (see, e.g., *People v. Rios* (2000) 23 Cal.4th 450, 461); and that an element of a reasonable person's reaction was also involved as to heat of passion (see, e.g., *People v. Breverman* (1998) 19 Cal.4th 142, 153-154). However, we disagree with Dixon that the trial court's instructions told the jurors that they were not to consider such elements.

The trial court's instructions, read in context and given a plain interpretation, did no more than remind the jurors that it was Dixon who was on trial, not any of them, and that they were to decide the case based on their determinations about Dixon's actions, not based on their sympathies about the case. Further, the court expressly told the jurors that they could rely on their own life experiences in deciding the case. They simply were not supposed to substitute themselves into Dixon's place, and the court properly so informed the jury. [3]

Even assuming the trial court committed instructional error, we would find the error harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Beltran* (2013) 56 Cal.4th 935, 955 [an instructional error in a criminal case is evaluated under *Watson* standard]; and see also *People v. Kelly* (1992) 1 Cal.4th 495, 526 [accord].) The trial court's remaining instructions and the legal arguments of the lawyers correctly explained all of the law relevant to Dixon's case, and he does not contend otherwise. The

---

[3] We summarily reject Dixon's contention that the court's rulings in response to the prosecutor's objections amounted to a comment on the evidence. The court did not express any opinion on how the jury should resolve the evidence.

6

evidence that Dixon committed a murder was overwhelming.  Further, given the correct jury instructions, the arguments of the lawyers, and the strength of the evidence against Dixon, we would find any error related to the trial court's passing instructions during defense counsel's argument to have been harmless even were we to apply the constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24.

## II.    The Probation Report Issue

Dixon contends the trial court abused its discretion at the sentencing hearing when it denied his request to strike certain information from the probation report.  Specifically, Dixon argues that material in the report reflecting LBPD Detective McGuire's opinion that Dixon was not remorseful about his crime must be stricken because it was contrary to the detective's trial testimony that Dixon was forthcoming, remorseful, and cooperative during his post-arrest interviews.  Dixon expressly acknowledges that the prejudice from the detective's opinion in the probation report "lies not in the immediate results of the sentencing hearing," but rather, "lies in the future consideration [of] such information . . . ."  He plainly is postulating about a possible adverse effect on his release date from state prison insofar as he asserts that probation reports are "especially important with respect to defendants, such as [himself], sentenced to indeterminate terms to be fixed in the future by the Board of Parole Hearings."  We find no abuse its discretion.

A sentencing court has the discretion to correct or to strike a probation report, in whole or in part.  (See Cal. Rules of Court, rule 4.437(d) & (e); and see generally *People v. Municipal Court* (*Lopez*) (1981) 116 Cal.App.3d 456, 458-459.)  The purpose of this discretion is to assure that probation reports are founded on accurate and reliable information, thus affording fundamental fairness to a defendant on matters related to the report.  Accordingly, when a defendant believes the probation report is insufficient or inaccurate, or is based upon unreliable information, he may present evidence to counteract or correct any portion of the report.  (*People v. Bloom* (1983) 142 Cal.App.3d 310, 320.)  As a general rule, reversal is not required unless the trial court has relied on the inaccurate information.  (*People v. Phillips* (1977) 76 Cal.App.3d 207, 215.)

7

Assuming without deciding that potential adverse effects in the future are properly considered in addressing the accuracy of a probation report, Dixon has not shown an abuse of discretion. His claim fails because it is based on a predicate that is not supported by the record, namely, his contention that Detective McGuire testified at trial that he believed Dixon was remorseful, only to state in the probation report that he believed Dixon was not remorseful. A careful review of the cited trial testimony shows that Detective McGuire did not testify that he believed Dixon was remorseful for his crime. The detective's testimony, on cross-examination, was that Dixon was very forthcoming in expressing remorse to the detective during the post-arrest interviews. The detective's trial testimony acknowledging the *fact* that Dixon expressed remorse during the post-arrest interviews does not contradict the detective's *opinion* in the probation report that he did not believe that Dixon was, in fact, remorseful. The probation report does not indicate that Detective McGuire asserted that Dixon never expressed remorse, in contradiction to his trial testimony. On the contrary, the probation report shows Detective McGuire again acknowledged Dixon's expressions of remorse, but stated that "he does not believe that [Dixon] is truly sorry for his crime."

## DISPOSITION

The judgment is affirmed.


BIGELOW, P. J.

We concur:


RUBIN, J.



GRIMES, J.


8