Filed 9/23/24  P. v. Valladares CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NOE COLIMA VALLADARES,<br><br>    Defendant and Appellant. | D081969<br><br><br>(Super. Ct. No. SCD296578) |


APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Daniel Rogers, Christopher P. Beesley and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

Noe Colima Valladares appeals an upper term sentence imposed after a jury found him guilty of assault by means likely to produce great bodily injury.  He contends that:  (1) three of four aggravants on which the trial

court relied in selecting the upper term should not have been considered because they were not proven beyond a reasonable doubt; (2) two of those three aggravants should not have been considered because the court's findings on those aggravants were an abuse of discretion; and (3) trauma he suffered as a child outweighed the one unchallenged aggravant. We disagree. Hence we affirm.

## I.
## Factual and Procedural Background

### A.    *Valladares's Conduct*

One afternoon in October of 2022, a man (R.H.) in the second-floor unit of an apartment building on El Cajon Boulevard noticed an unusual sight: a stranger staggering around in the middle of the road, yelling, stepping into the path of oncoming cars, and "trying to kick [the cars] as they would pass." As R.H. watched, the stranger (Valladares) "sudden[ly] . . . turned our way[,] . . . beelined it towards [our] building," "ran straight for the door" to a unit on the ground floor, and slammed himself against it.

On hearing the "bang" of Valladares colliding with the door, R.H. "went downstairs to see what was going on." What he found after descending the stairs was Valladares—flat on his back, on a concrete walkway —yelling and screaming, kicking at the door he had just rammed (and broken), and seemingly battling an orange electrical cord that somehow had become snarled around him.

In the words of R.H., Valladares seemed "very upset that he had the cord around him. It [was] like he thought it was a serpent." "It looked like, in his face, like it was a snake or something. He had a real frightened look in his face." In the words of another witness, Valladares "was entangled in the cord," "it appeared . . . as though the cord was attacking him," and he "was

2

yelling almost the entire" time—but "all I heard was 'help me,'" and "the rest [was] mostly gibberish."

With the assistance of a neighbor (D.L.), R.H. endeavored to disentangle Valladares from the cord. Meanwhile, as R.H. and D.L. (both 66 years of age) worked to extricate the much younger (33 year-old) Valladares from his predicament with the cord, Valladares "continued to yell incoherently," "in a frightened, angry" way, and "continued to look confused and as though th[e] cord w[ere] still attacking him."

Ultimately, R.H. and D.L succeeded in extricating a "dazed" and "confused" Valladares from the cord. But no sooner had they done so than Valladares—whom the trial court described as "a strong young man"—leapt to his feet and punched D.L. in the jaw, knocking him to the ground.

Then Valladares turned toward R.H., repeatedly hit R.H. in the head, shoulders, arms, and ribs, and kicked R.H.'s legs. As recounted by R.H.: "I fell to the ground and just covered my head, because he would not stop."

Eventually, R.H. was able to escape the onslaught. An ambulance arrived, and medics recommended he be transported to a hospital for treatment.[1] But R.H. declined: "I just did my own triage at home. [¶] I . . . don't like hospitals, and because I got cancer, I have been there too much lately."

As for Valladares, he remained in the area and could be seen "on the ground," still "screaming nonsense," when police arrived.

---

[1] R.H. experienced "pretty bad bleeding," extensive swelling and bruising to his face and other parts of his body, and a loss of hearing in one ear. The bruising took two months to heal, and the hearing loss persisted through at least the time of trial.

3

## B.  *Trial*

The district attorney charged Valladares with several violations of the Penal Code, the case proceeded to trial, and a jury returned verdicts of guilty on one count of assault on R.H. by means likely to produce great bodily injury, in violation of Penal Code section 245, subdivision (a)(4),[2] and one count of vandalism, in violation of section 594, subdivision (a)(b)(2)(A).

Then the case proceeded to a bench trial, at which the trial court made true findings on four aggravating factors.  These were:

1.  The offense involved great violence (California Rules of Court, rule 4.421(a)(1));[3]

2.  R.H. was a particularly vulnerable victim (rule 4.421(a)(3));

3.  Valladares had served a prior term in prison (rule 4.421(b)(3)); and

4.  Valladares had been on parole when the crime was committed (rule 4.421(b)(4)).

(We refer to these four aggravants as the great violence, particularly vulnerable victim, prior prison, and parole aggravants.)  In addition, the court made a true finding on a prior strike enhancement.

## C.  *Sentencing*

In a statement in mitigation filed for the sentencing hearing, defense counsel made several arguments focused on childhood trauma and chronic drug abuse.  For example, in advocating that "Valladares's past trauma as a child [should] compel a dismissal of his [prior] strike" pursuant to section 1170.12, subdivision (c)(1), defense counsel asserted that:

---

[2]    All further statutory references are to the Penal Code.

[3]    All further rule references are to the California Rules of Court.

4

"At the age of 10, Mr. Valladares lost his mother. He began to use drugs and alcohol just a few years later at the early ages of 13 and 15. [He] entered the juvenile criminal justice system about this same time, shortly after losing his mother. [He] has had a lifelong drug addiction problem spanning from his childhood to the present. When not in custody, [he] has an almost daily drug use pattern, dating back to the age of 15. His drug use has had a severe impact on his life, as evidenced by his many drug related charges in the past, in addition to the present. Prior to his current incarceration, [he] was using methamphetamine daily."

Then, in advocating that the trial court should find as a mitigant that Valladares suffered from a mental or physical condition that significantly reduced his culpability for the crime (rule 4.423(b)(2)), defense counsel asserted that "Mr. Valladares ha[d] been addicted to . . . methamphetamine for most of his life, since the age of 15 years old," and that "his struggle with addiction has been lifelong."

Finally, in advocating that section 1170, subdivision (b)(6)(A)[4] should require the court to impose the low term of two years on the assault conviction, defense counsel asserted that:

"Mr. Valladares['s] childhood was filled with violence and drugs. At the young age of 10, he lost his mother. This clearly had an effect on him, as just a few short years later he's doing hard drugs and alcohol, and according to the probation report, as a juvenile had turned to the support of a gang. [He] was in the juvenile detention center on multiple occasions and suffered juvenile cases as a result. He was never able to finish school and realize skills for job prospects. He became addicted to substances, specifically methamphetamine. When homeless, [he] was not able to maintain any job and turned heavily to continued drug abuse throughout most of his life. Throughout most of his

---

4    Section 1170, subdivision (b)(6)(A) is discussed *post*.

5

life he has been incarcerated multiple times, even as a juvenile being housed in the detention facility many times, instead of working hard to resolve Mr. Valladares's drug addiction issues. As a result, [he] still suffers from the same drug addiction he has suffered since the age of 15, and this crime was a result of that addiction.[5]

Defense counsel repeated these themes at the sentencing hearing, and the trial court took note. Although it did not say it was making a true finding as to any mitigants (and did not refer to rule 4.423 or use terminology pertaining to mitigants), it nonetheless acknowledged that Valladares had had "certain difficulties . . . [with] drug use," that he had "had it tough growing up," and that these circumstances were "to be taken into consideration" in deciding on which term of incarceration (lower, middle, or upper) to impose for the assault conviction.

But the trial court concluded that, stacked against the four aggravants, these circumstances did not move the proverbial needle. "To put it bluntly," the trial court said to Valladares,

"[Y]ou are . . . a danger to the public. There's no doubt about it in my mind. [I]t's . . . not just an economic danger, but . . . a violence danger.[6]

---

[5] Defense counsel offered no evidence to support her assertions regarding childhood trauma and chronic drug abuse, and the probation sentencing report says that the probation officer "reviewed the Circumstances in Mitigation contained in Rule 4.423 and found none particularly applicable to this case." But the district attorney did not argue an insufficiency of evidence at trial, the Attorney General does not make such an argument on appeal, and the probation report corroborates defense counsel's assertion that Valladares's mother died he was 10 years old and references four occasions (two in 2016 and one each in 2019 and 2020) when Valladares tested positive for methamphetamine or displayed symptoms of being under the influence of a controlled substance.

[6] In making this statement, the trial court was focusing on section 1385,

6

> "So even though you have this childhood trauma, . . . I don't think it outweighs [the four] aggravants. [Any one of the aggravants taken] individually . . . do[es]n't justify the upper term. [But all of them] taken together . . . definitely justify the upper term."

On this basis, the trial court imposed the upper term of four years on the section 245, subdivision (a)(4), assault conviction, and then doubled that term to eight years because of the prior strike enhancement.

Valladares timely appealed.

## II.
## Discussion

The sole issue on appeal is whether the trial court erred in imposing the upper term for the assault conviction. As noted *ante*, Valladares contends the trial court erred in several respects in imposing the upper term. We address each of these points of error below. But, before doing so, we briefly discuss the statutory regime against which those points are framed.

### A. *The Statutory Framework*

The jury found Valladares guilty of having committed an assault on R.H. by means likely to produce great bodily injury, in violation of section 245, subdivision (a)(4). That provision specifies three possible terms of imprisonment: two years, three years, or four years. Another provision of the Penal Code—section 1170, subdivision (b)(1)—says that, subject to certain exceptions: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound

---

subdivision (c), pertaining to a court's discretion to strike or dismiss an enhancement. Subdivision (c)(2) of section 1385 refers to certain mitigants that are to "weigh[] greatly in favor of dismissing the enhancement, *unless the court finds that dismissal of the enhancement would endanger public safety*." (Italics added.)

7

discretion, order imposition of a sentence not to exceed the middle term." (See § 1170, subd. (b)(1); accord, rule 4.420(a).)

Among the exceptions to the directive of section 1170, subdivision (b)1 is subdivision (b)(2) of the same section, which states that a court *may* depart to the *upper* term in situations in which one or more aggravants justify an upward departure and the facts underlying those aggravants *have been proven beyond a reasonable doubt* at trial. (Accord, rule 4.420(b).)

But there also are considerations that cut in the opposite direction, i.e., considerations that warrant a departure to the *lower* term. Among them is the directive of section 1170, subdivision (b)(6)(A), which provides that: if the defendant experienced childhood trauma, and if the childhood trauma was a contributing factor in the commission of the offense, then—notwithstanding the directive of subdivision (b)(1)—the court *must* impose the *lower* term "*unless the court finds that the aggravating circumstances outweigh the mitigating circumstances* [*such*] *that imposition of the lower term would be contrary to the interests of justice*." (Italics added; see also rule 4.420(e)(1)).

B. *Analysis*

1. **Whether the Great Violence, Particularly Vulnerable Victim, and Parole Aggravants Were Proven Beyond a Reasonable Doubt**

Keying in on the requirement that the facts underlying an aggravant must be proven beyond a reasonable doubt, Valladares's first contention on appeal is that the trial court erred in imposing the upper term because the great violence, particularly vulnerable victim, and parole aggravants on which it relied in departing upward did not meet that exacting standard.[7] In

---

[7] The Attorney General argues that Valladares forfeited his claim that the trial court failed to apply the beyond a reasonable doubt standard. He

8

support of this contention, Valladares notes that, when it made its true finding on the prior strike enhancement, the trial court expressly stated that this finding was beyond a reasonable doubt.  But, he points out, the trial court made *no* mention of the burden of proof when it made its true findings on the three aggravants (great violence, particularly vulnerable victim, and parole) that did not pertain to priors.[8]

  The observation is correct, but the contention lacks merit.

---

likewise argues that Valladares forfeited his claim (discussed *post*) that the court erred in making true findings with regard to the particularly vulnerable victim and great violence aggravants.  Valladares in turn argues no forfeiture occurred.  Rather than decide the forfeiture dispute, we instead exercise our discretion to proceed on the merits.  (Cf. *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [reviewing courts are vested with discretion to consider forfeited issues].)

[8] To be precise, the trial court also made no mention of the burden of proof when it made its true finding with regard to the one aggravant that Valladares is *not* challenging: i.e., the prior prison aggravant.  The prior prison aggravant and the prior strike enhancement in this case each happen to have arisen from the same conviction, but it should be understood that they derive from two fundamentally *different* provisions of law.  In this regard:  The prior prison aggravant is rooted in rule 4.421 and 4.421(b)(3), which provide that "[c]ircumstances in aggravation include factors relating to the defendant" and that "[f]actors relating to the defendant include that . . . [t]he defendant has served a prior term in prison or county jail under section 1170(h)."  By contrast, the prior strike enhancement is rooted in section 1170.12, subdivision (c)(1), which provides that, "[i]f a defendant has one prior serious or violent felony conviction as defined in subdivision (b) that has been pled and proved, [then] the determinate term or minimum term for an indeterminate term shall be twice the term otherwise provided as punishment for the current felony conviction."  In essence, Valladares is conceding that the trial court's true finding beyond a reasonable doubt with regard to the prior strike enhancement should be construed, as well, as a true finding beyond a reasonable doubt on the prior prison aggravant.

9

Less than 24 hours before the alleged aggravants were found true, the trial court asked Valladares whether he would prefer that they be tried by the court or by the jury.  In posing this choice to Valladares, the trial court emphasized that, either way, the aggravants would have to be proven beyond a reasonable doubt:

> "Mr. Valladares, if a jury decides this, it means that all 12 jurors would listen to whatever evidence the prosecutor provides.  The jurors would have to all unanimously agree *beyond a reasonable doubt* [that] those aggravating factors are true.  If you waive jury and have a trial in front of me, *the standard of proof is* still the same, proof *beyond a reasonable doubt*, but the prosecutor only has to convince one person to that standard, namely me, not the 12.  [¶]  It is completely up to you."

Then, after Valladares twice stated he would waive the right to have the alleged aggravants tried to the jury, the trial court again stated the burden of proof:  "Okay.  That means I would decide whether or not these things are all true *beyond a reasonable doubt* rather than a jury."

The following morning, the trial court's first words after taking the bench and announcing the case were:  "This is the date set for the trial . . . on the aggravating factors.  [¶]  The people have the burden of proof.  The standard is proof *beyond a reasonable doubt*."

The ensuing bench trial was short.  Applying the reporter's transcript as a yardstick, we note that, after the trial court stated the burden of proof, there ensued just four pages of argument by counsel (including colloquy with the court), capped—at the top of page five—with the court's conclusion that the four aggravants "have all been proven."

Under the circumstances just described, we conclude the trial court was mindful of the correct burden of proof—and that it applied that correct burden of proof—when it made its true findings on the aggravants.  (Cf.

10

*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law."]; *People v. Thomas* (2011) 52 Cal.4th 336, 361 [similar; "it is clear the court was aware of the appropriate standard to apply"].)

## 2. Whether the Particularly Vulnerable Victim and Great Violence Aggravants Were Supported by Substantial Evidence

Valladares's second contention is that the trial court's true findings with regard to the particularly vulnerable victim aggravant and the great violence aggravant were an abuse of discretion. A court abuses its discretion when it makes a finding in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice. (*People v. Brooks* (2024) 99 Cal.App.5th 323, 339.)

## 3. The Particularly Vulnerable Victim Aggravant

Valladares argues the trial court erred in finding R.H. was a particularly vulnerable victim on the grounds that a victim's vulnerability should be "measured largely by the defendant's purposeful selection of that victim because of his vulnerability," and here, there was no evidence that Valladares selected R.H. as a victim because of his age or other vulnerability. In fact, Valladares argues, he could not possibly have targeted R.H. for his vulnerability because he (Valladares) was suffering from delusions at the time he engaged with R.H. Valladares further notes that R.H. voluntarily approached him, rather than vice versa.

In evaluating this argument, we begin by observing that "vulnerability" in the context of rule 4.421(a)(3), has been held to mean "defenseless, unguarded, unprotected, accessible, assailable" (*People v. Lewis* (2023) 88 Cal.App.5th 1125, 1138 (*Lewis*)) and that a " ' " 'particularly vulnerable' victim is one who is vulnerable 'in a special or unusual degree, to an extent greater than in other cases.' " ' " (*Ibid*.) " ' " 'Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*Ibid*.) "A victim is considered particularly vulnerable 'where the age or physical

11

characteristics of the victim, or the circumstances under which the crime is committed, make the defendant's act especially contemptible.' " (*Ibid.*) Courts have found that "particularly vulnerable victims" include individuals attacked while asleep (*People v. Smith* (1979) 94 Cal.App.3d 433, 435), elderly victims who live alone attacked at home (*ibid.*), unarmed parents with their children in a playground (*People v. Esquibel* (2008), 166 Cal.App.4th 539, 558), and victims of gross vehicular manslaughter. (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321–322.)

Valladares's sudden unprovoked attack on R.H. in this case came at a moment when R.H. was rendering aid. A victim who has no advance warning of the ensuing danger may be characterized as particularly vulnerable. (See, e.g., *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1182 [victim of gross vehicular manslaughter who had no advance warning or ability to avoid a wrong-way driver was particularly vulnerable].) R.H. had no advance warning that by helping Valladares, he was in danger of a physical beating.

As noted above, Valladares argues that to support a finding of particular vulnerability, the defendant must have purposefully targeted the victim for his vulnerability. Assuming but not deciding that purposeful selection of the victim is a component of a particularly vulnerable victim finding, the record supports such a purposeful selection here. Valladares could tell R.H. was an older and smaller individual just by looking at him. Further, once R.H. had fallen to the ground and covered his head, it would have been apparent that R.H. was completely defenseless and unprotected, and therefore particularly vulnerable to the continuing assault. (*Lewis, supra,* 88 Cal.App.5th at p. 1138).

As for the argument that Valladares could not have targeted R.H. for his vulnerability because he (Valladares) was suffering from delusions, it is at odds with the findings of the jury. In this regard, Valladares premises his argument on a contention that he could not possibly have made a decision to target R.H. for his vulnerability because "[t]he undisputed evidence is that Valladares was completely

out of his mind at the time of the incident."[9]  But the jury's verdicts of guilty on the assault and vandalism counts support an inference to the contrary.  Specifically, the jury was instructed that it could not find Valladares guilty on the assault charge unless it found he had acted "willfully"—meaning "willingly or on purpose"—and that it could not find him guilty on the vandalism charge unless it found he had "intentionally do[ne] a wrongful act or . . . act[ed] with some unlawful intent."  In other words, the jury affirmatively found that Valladares was *not* out of his mind.  On this record, we cannot conclude that a finding that Valladares had purposefully targeted R.H. for his vulnerability would have been arbitrary, capricious, or patently absurd such that it would require us to conclude that the trial court had abused its discretion.

### 4.    The Great Violence Aggravant

As for Valladares's challenge to the great violence aggravant, we have read a description of R.H.'s injuries and have viewed a video clip (exhibit 14) in which Valladares is shown raining down blows on R.H.  Based on this evidence, it is apparent to us that the trial court did not abuse its discretion in finding that the assault on R.H. involved great violence within the meaning of rule 4.421(a)(1).

Valladares argues that, to establish this aggravant, it is necessary to find not only that the crime involved great violence but that the defendant exhibited mens rea.  In support of this argument, he cites the phraseology of rule 4.421(a)(1)—which, by its terms, applies only in instances in which the crime involved "[1] great violence, [2] great bodily harm, [3] threat of great bodily harm, or [4] other acts *disclosing a high degree of cruelty, viciousness,*

---

[9]    Valladares' counsel stated at oral argument that Valladares would not be challenging the trial court's particularly vulnerable victim finding were it not for her view that Valladares had been unable to formulate an intent at the time of the incident.

*or callousness*" (rule 4.421(a)(1), italics added)—and he argues that the passage we have italicized should be construed as modifying *each* of the four enumerated antecedents rather than just the last.

In evaluating this argument, we consider the last antecedent rule, a " 'longstanding rule of statutory construction[, which] . . . provides that "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote." ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743.) Under this rule, "[a] limiting clause is to be confined to the last antecedent, unless the context or evident meaning requires a different construction." (*Anderson v. State Farm Mutual Automobile Insurance Company* (1969) 270 Cal.App.2d 346, 349.)

We discern no context or evident meaning that warrants application of the qualifying phrase (i.e., "disclosing a high degree of cruelty, viciousness, or callousness") to the more remote phrase: "great violence." Hence we decline Valladares's invitation to apply a mens rea requirement to the great violence aggravant, and we conclude the trial court's true finding on this aggravant was not an abuse of discretion.

### 5. Whether Aggravants Outweighed Mitigant(s)

Valladares's final contention is that the trial court abused its discretion in concluding the aggravants outweighed the mitigant(s), in declining on this basis to impose the lower term, and in imposing the upper term instead. Invoking the statutory framework discussed *ante*, he argues that:

> "[W]here, as here, the defendant suffered childhood trauma which contributed to the offense, the *low term* is the presumptive term and the court may not impose the middle term unless 'the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice.' (§ 1170, subd. (b)(6).)

14

> "It follows that[,] where a presumptive low term applies, the court is precluded from imposing an *upper term* sentence except in extraordinary circumstances, where the aggravating factors so far outweigh the mitigating factors as to justify a two-step *departure* from the presumptive low term. Put another way, where the legislature has identified 'super-mitigating' factors which establish a presumptive low term, an upper term may not be imposed absent the presence of 'super-aggravating' factors.
>
> "Here, . . . the court abused its discretion in finding that the aggravants justified departure from the low term to the *middle term*. But even assuming, arguendo, that the aggravants justified a departure from the low term default maximum to the middle term, they certainly did not justify a two-step increase to the upper term."

As noted *ante*, the trial court made several findings and drew several conclusions that informed its decision to impose the upper term: It found one or more mitigants rooted in childhood trauma and drug use. It found four aggravants. And it concluded that—as measured against the mitigant(s)—none of the four aggravants "individually" would warrant the upper term, but all four "taken together" would. Each of these determinations was within the trial court's discretion. We have found no abuse of discretion. And thus we see no reason to disturb the sentence imposed.

## III.
## Disposition

The judgment is affirmed.


KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.