Filed 10/22/25  P. v. Brown CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064132 |
| v. | (Super. Ct. No. RIF2103706) |
| LOUIS EDWARD BROWN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge. Affirmed in part and reversed in part.

Law Offices of Brad Poore and Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Caelle Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

After a jury convicted defendant Louis Edward Brown of rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)) and kidnapping (*id.* at § 207), the trial court sentenced him to an aggregate prison term of nine years and eight months. On appeal, he contends the court erred in admitting evidence of a decades old uncharged alleged prior rape over his Evidence Code section 352 objection.[1] He also argues the court committed constitutional and statutory error in imposing the upper term sentence on the rape count based on aggravating factors not tried to the jury. We find no abuse of discretion concerning the admission of evidence, but agree the court prejudicially erred in its use of aggravating factors during sentencing. Accordingly, we vacate Brown's sentence and remand the matter for further sentencing related proceedings, but we otherwise affirm the conviction.

FACTS

One evening in mid-2021, L.L. and her husband, T.L., decided to have drinks at a couple of places they occasionally frequented in the downtown area of the City of Riverside. T.L. drove that night. L.L. had two martinis at the first location and a scotch whiskey, which the bartenders potentially topped off a couple of times, at the second. Toward the end of the night, she and her husband got into an argument. She became frustrated with not winning the argument, so she left and told her husband she would meet him at the car.

L.L. walked toward the locations where they normally parked their car when they came to downtown Riverside, but she could not locate it. As she walked, she started to feel the effects of the alcohol she had consumed.

---

[1] All further statutory references are to the Evidence Code unless indicated otherwise.

2

With her high-heeled shoes in hand, figuring T.L. had already driven off in the car, L.L. decided to walk along the route they would typically take to get home thinking he might see her. The area was very dark, so she made her way to a more frequented and well-lit street.

As L.L. continued down the street, feeling dizzy and having trouble balancing, she tripped and fell. Her shin hit the curb. As she struggled to stand up and regain her footing, a gold pickup truck approached. An African American male, later identified as Brown, stopped the truck and approached L.L. After she told him "I'm fine," he opened the right-side doors of his truck. As he "eased her down" "very gentl[y]" onto the rear passenger seat of the truck, L.L. was confused but thought Brown was trying to help her. After Brown quickly shut the truck doors, L.L. could not locate a door handle to open the rear passenger door.

After other events transpired, some of the facts of which were disputed at trial, Brown stopped at a gas station. While he was inside the convenience store, L.L. got out of the truck and ran away. She eventually connected with T.L. who came to pick her up. A couple of days later, L.L. told T.L. that Brown raped her.

Brown was arrested and charged with one count of rape of an unconscious person and one count of kidnapping with an intent to commit rape. Among those testifying at trial were L.L., T.L., and a police detective who spoke both to L.L. after she reported what happened and to Brown when he was arrested.

At trial, L.L. testified Brown did not speak much when he picked her up. Shortly after he closed the doors to the truck, she said to him, "I appreciate what you're trying to do, but if you could just drop me off at the next intersection and let me out so I can stand on a sidewalk. Then my

3

husband can see me, and I can get a ride home." Brown did not respond and he drove past the next intersection. L.L., starting to panic, then asked him to "just drop [her] off at the next spot where there[] [was] a sidewalk." He did not respond or stop, and shortly thereafter L.L. "passed out."

The next thing L.L. remembered was feeling pressure on her lower abdomen and opening her eyes to see Brown finishing having sexual intercourse with her. He seemed calm, but looked around and told her, "It's not safe here. We have to go someplace else." L.L. felt terrified and asked if he was "going to take [her] someplace safe." He confirmed he was.

They drove to a gas station and Brown asked L.L. if she wanted anything; she declined. As soon as he was inside the convenience store, she climbed into the front seat and exited the truck through the driver's side door which was unlocked. As she ran away, she encountered a few people who she told some variation of the following: "That man gave me a ride, and he wouldn't let me out of the truck. And I think he was going to try to hurt me"; "Please, please don't get yourself involved. I just need to get away from here." When she reached the well-lit sidewalk adjacent to a nearby fast food restaurant, she was approached by a woman who offered to call T.L. for her. L.L. declined the offer, but looked in her own clutch purse and saw her phone which she had thought all along she did not have.

After unsuccessfully attempting to get a rideshare home, L.L. eventually spoke to T.L. on the phone and he came to pick her up. Because she felt "ashamed" and "stupid," she did not tell him at that time what had happened. A few days later, after reporting the incident to law enforcement, L.L. told T.L.

T.L. testified that after he and L.L. got into an argument on the night in question, L.L. left and he intended to pay the bill and catch up with

4

her. It was shortly before 2 a.m. and he tried, but he could not find her. After numerous phone calls and text messages to L.L. with no response, she finally called him around 3 a.m. She sounded afraid, panicked, and stressed, and she could not articulate her location. By describing things around her, T.L. figured out where she was and went to pick her up. For the next couple of days, L.L. went along with T.L. wherever he went, which T.L. said was unusual.

In conjunction with cross-examination of the police detective who interviewed Brown upon his arrest, the jury watched the videotaped interview with Brown. Brown explained he had a job but was homeless and slept in his truck. He said he would often drive around when he was aroused, "look for a lady," tell them he wanted to have sexual intercourse, and then drop them off after. But he denied ever forcing anyone against their will.

As for the night in question, Brown admitted during the interview that he picked up L.L. as she was walking down the street and had sexual intercourse with her in his truck. However, his details of exactly what took place were different than what L.L. described. He repeatedly denied doing anything against L.L's will and denied using any force.

Brown recalled stopping his truck when he saw L.L. walking on the side of the road and asking if she needed help. She told him she just came from the clubs in downtown and was "drunk," and she said "it was God sent that [he] was there[] [and] that she really needed a ride." At first he indicated she got in and out of the truck on her own, but later in the interview he said he may have had to help her in, "just like a gentleman would," so she would not fall. On multiple occasions, he denied shoving her or otherwise using force to get her into the truck.

5

Brown said shortly after L.L. got in the truck, he brought up sex, which he does with all women when he goes around looking for it. Even though she told him she was married, it seemed she was okay with the idea because she responded by telling him she did not have any underwear on. She "was in a very good mood" and asked if he could drop her off somewhere after; he said "yes." Brown drove down the street and parked right behind what he thought was a police station because he felt safe there. Within five minutes of picking her up, they had sexual intercourse. She was awake the entire time, "she was hugging [him]," "there was . . . passion," and she thanked him for using a condom.

According to Brown, "it was a quicky," and he felt "nervous" because they were parked adjacent to houses and he thought someone might get upset seeing people having sex outside their house. L.L. was upset when he stopped, but he wanted to go to a better spot so they could finish. He drove to a gas station, went inside to get a couple of things, and was surprised to find she was gone when he came out. Two men approached him as he was about to drive away, telling him he was going to go to jail. He assumed one of the men was L.L.'s husband but otherwise did not think anything of it because he felt he did nothing wrong.

Over Brown's objection, the jury also watched the videotaped conditional examination of a woman in her mid-70s who said Brown raped her roughly 10 years before the night in question. Law enforcement interviewed Brown after the former incident, but no rape charges were ever filed.

The jury convicted Brown of rape of an unconscious person and kidnapping, but it found him not guilty of kidnapping with an intent to rape.

The trial court sentenced him to an aggregate prison term of nine years and eight months.

Brown timely appealed.

DISCUSSION

Brown's arguments on appeal are limited to evidentiary and sentencing matters. First, Brown contends the trial court abused its discretion in admitting the conditional examination testimony about the alleged prior rape pursuant to sections 1101, subdivision (b), and 1108, arguing it should have been excluded pursuant to section 352. Second, he claims the court unlawfully imposed the upper term sentence on the rape count based on aggravating factors not tried to the jury. We find no error regarding the former but agree prejudicial error as to the latter requires us to vacate Brown's sentence and remand the matter for further sentencing related proceedings.

I.

ADMISSION OF EVIDENCE CONCERNING PRIOR UNCHARGED RAPE

Before trial, the prosecution sought to have the trial court deem admissible the testimony of C.P., a woman who said Brown raped her about 10 years before the alleged rape of L.L. Responding to the prosecution's assertion the testimony was admissible under sections 1101, subdivision (b), and 1108, Brown argued the testimony should be excluded as unduly prejudicial under section 352.

Brown contends the trial court abused its discretion in allowing the testimony to come in over his section 352 objection. We conclude otherwise.

*A. Conditional Examination of C.P.*

Roughly a year and a half prior to trial, when C.P. was 76 years old, C.P. underwent a conditional examination. Trial counsel for both sides had the opportunity to question her.

C.P. explained that in mid-2010, she lived in a one bedroom apartment within a senior citizen complex in Compton, California. Her health was poor, she used a cane to walk due to a shattered ankle, and she had trouble remembering things. Because of her condition, she had a caregiver who would assist her with everything from cooking and cleaning to bathing and medical appointments.

One day, when her caregiver was not around, a cable company employee came to fix her cable box and television at her request. She recalled the employee being a black male of medium height with curly hair. The prosecutor showed C.P. a photo of Brown and stood Brown directly in front of her, and C.P. identified Brown as the cable company employee.

According to C.P., after Brown entered her apartment and started to fix the television, he began asking her questions about sex. She thought it was disrespectful and it made her upset, but he laughed at her when she relayed that to him. He started to approach her, grabbed her, and threw her to the floor. C.P. screamed and told him "no" and "stop," but Brown proceeded to have vaginal intercourse with her. When he finished, he wiped himself off with paper towels, threw them on the floor, and left. C.P. later reported the incident to her caretaker, the person who managed the apartment complex, and law enforcement.

On cross-examination, C.P. confirmed she gave law enforcement the paper towels Brown threw on the floor. She also admitted to being irritated with law enforcement because she followed up with them a few

8

times, but "it just seemed like they dropped the ball . . . [and] forgot about it." Consistent with her direct examination testimony, there was a lot she could not remember and she said she could "hard[l]y remember a lot of things."

*B. Additional Procedural Background*

The parties and the trial court discussed the admissibility of C.P.'s testimony multiple times, including whether it should be excluded under section 352.

Throughout, the prosecutor's position was the testimony was admissible propensity evidence under section 1108 and admissible under section 1101, subdivision (b), to show intent, lack of mistake, and a common scheme or plan. And, it was particularly probative because of similarities between Brown's alleged conduct in the prior incident and the one charged. Among the similarities the prosecutor noted were that both involved the rape of an older woman, both victims were vulnerable at the time of the attack, and Brown admitted to having sexual intercourse with both women but claimed it was consensual.

In contrast, Brown argued the testimony would be "far more prejudicial than probative," and would effectively require him to defend against two rape charges instead of just the one involving L.L. He based his argument on the following: the uncharged rape was remote in time, allegedly occurring 11 years before the charged incident; the only commonality was an age difference between Brown and the alleged victims; law enforcement investigated the prior incident, but the only resulting charge was firearm related; all law enforcement documents concerning the incident, including a report about an interview with Brown, had since been destroyed except for a report documenting C.P.'s original complaint; C.P. previously spent some

9

time in a psychiatric hospital; and during the conditional examination, she could not remember a lot and appeared to be "missing some faculties."

Before ruling on the day before opening statements began, the trial court inquired whether C.P. would testify at trial. The prosecutor indicated it was the intent all along that she would, but it was no longer clear whether she would be able to because she had been admitted to the hospital. If she was unable to travel, the prosecutor intended to seek to admit into evidence the videotaped conditional examination.

Ultimately, C.P. was not able to travel to testify and the trial court allowed the one-and-a-half-hour conditional examination to be played to the jury. Before it was played, the court preinstructed the jury with CALCRIM No. 1191, which explained, inter alia, the jury was only allowed to consider the evidence of the uncharged offense "if the People proved by a preponderance of the evidence that [Brown] did, in fact, commit the uncharged offense," and even then, it would not be "sufficient by itself to prove that [Brown was] guilty of the charged crimes."

C. *Applicable Law and Standard of Review*

"As a general rule, 'propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' [Citations.] But . . . section 1108, subdivision (a) provides an exception to this rule: 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352.' [S]ection 352, in turn, provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of

10

confusing the issues, or of misleading the jury.'" (*People v. Dworak* (2021) 11 Cal.5th 881, 899 (*Dworak*).)

In making a determination under section 352, the trial court "should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.'" (*Dworak, supra*, 11 Cal.5th at p. 900.)

Ultimately, the admissibility of section 1108 evidence, including a section 352 determination, "'"is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.'"'" (*Dworak, supra*, 11 Cal.5th at p. 900.) Thus, "[a]s a reviewing court, we accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice." (*Id.* at p. 899) That is, we will affirm the court's determination unless it is shown "'"the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. Miles* (2020) 9 Cal.5th 513, 587, 587–588.)

D. *Analysis*

Brown argues "[t]he probative value of C.P.'s testimony 13 years [after the alleged rape] . . . was virtually nil, and the prejudice [in admitting it] was significant." He emphasizes that law enforcement investigated the alleged rape of C.P. by, among other things, interviewing him, but rape

11

charges were never filed. Instead, the investigation only led to a firearm related charge. And, although a report written around the time of the prior incident directed the reader to cross-reference a separate report documenting the interview with Brown, law enforcement records indicated the latter report had since been destroyed. Thus, he argues, he "had no viable way to fight against the prior rape allegations."

There is no doubt evidence admitted pursuant to section 1108 concerning a prior uncharged, alleged sexual offense is inherently prejudicial, to some degree. However, viewing the record in this case as a whole, we cannot say the trial court abused its discretion in determining the probative value of C.P.'s testimony outweighed the potential prejudice it carried.

Comparing the two alleged rapes side-by-side, there were parallels between them and the details of the prior one were not more inflammatory than those of the one charged. Both victims were significantly older than Brown, and both were alone and particularly vulnerable at the time—C.P. was weak and injured, and L.L. was inebriated. Additionally, in each situation, Brown played a role that led the victims to trust him. With C.P., he came to repair her television, and with L.L. he stopped to see if she was okay and offer her a ride. To the extent there were dissimilarities between the two incidents, our high court has made clear, "differences in the manner in which the acts were committed or in the characteristics of the victims, while potentially relevant, are not dispositive." (*Dworak, supra,* 11 Cal.5th at pp. 901–902.)

Although C.P. was unable to testify at trial, Brown's counsel had the opportunity to cross-examine her during a conditional examination, knowing it could be presented to the jury at trial if C.P. became legally unavailable. (See Pen. Code, § 1345.) This included the ability to challenge

12

C.P.'s memory of what transpired. And at trial, the jury was able to hear C.P.'s testimony and observe her recorded demeanor, allowing it to judge credibility and weigh evidence to the same extent it normally would as the trier of fact.

We recognize passage of time was arguably more impactful in this case than in others. On one hand, 10 years generally does not significantly diminish the probative value of an alleged prior sexual offense when the prior and current offenses have substantial similarities. (See *People v. Pierce* (2002) 104 Cal.App.4th 893, 900; *People v. Branch* (2001) 91 Cal.App.4th 274, 285.) On the other hand, in this case it provided enough time for law enforcement records allegedly documenting Brown's version of the alleged incident to be destroyed. Even so, we do not find the timing to have rendered the evidence so prejudicial as to warrant a conclusion the trial court abused its discretion in admitting the evidence over a section 352 objection.

Notably, the trial court's handling of the prior uncharged offense evidence before the jury reduced its potential prejudice. Both prior to the playing of the conditional examination and prior to deliberations, the court instructed the jury with CALCRIM No. 1191, a limiting instruction on the consideration and use of evidence admitted under section 1108. It conveyed, inter alia, that if the jury found by a preponderance of the evidence Brown committed the prior uncharged rape, it could use that as "only one factor to consider along[] with all the other evidence" and it was "not sufficient by itself to prove that [Brown was] guilty of the charged crimes." Absent some contrary indication in the record, which there is not in this case, we presume jurors follow the instructions they are given, "including instructions that

limit a jury's consideration of evidence for certain purposes." (*People v. Washington* (2017) 15 Cal.App.5th 19, 26.)

For all these reasons, we conclude the trial court did not abuse its discretion in admitting C.P.'s conditional examination testimony.

II.

CONSIDERATION OF AGGRAVATING FACTORS AT SENTENCING

Prior to imposing a sentence, the trial court found true four aggravating factors alleged in an amended information: (1) L.L. was particularly vulnerable; (2) the offense was carried out with planning, sophistication, and professionalism; (3) Brown engaged in violent conduct which indicated a serious danger to society; and (4) Brown had numerous prior convictions which were of increasing seriousness. Based on those findings, the court imposed the upper term of eight years in prison on the rape count.

The parties agree the record does not reflect Brown personally or expressly waived his right to a jury trial on the aggravating circumstance allegations, meaning they agree the court erred in relying on those circumstances to impose the upper term on the principal count. (See *People v. Wiley* (2025) 17 Cal.5th 1069, 1078 (*Wiley*); *People v. French* (2008) 43 Cal.4th 36, 47.) Their disagreement centers around whether such error was prejudicial under the circumstances. On the record before us, we conclude it was.

A. *Applicable Law*

"Under the Fifth and Sixth Amendments to the United States Constitution, 'any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.' [Citations.]

14

'Inhering in that guarantee is an assurance that a guilty verdict will issue only from a unanimous jury.'" (*Wiley*, *supra*, 17 Cal.5th at p. 1078; accord *Erlinger v. United States* (2024) 602 U.S. 821, 830–832 (*Erlinger*); *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*).)

"[Penal Code] [s]ection 1170[, subdivision] (b)(2) similarly provides that the trial court may impose a sentence exceeding the middle term only when circumstances in aggravation of the crime justify imposition of an upper term sentence, and 'the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt' at a jury or court trial. Construing this statutory scheme in light of [prior California Supreme Court precedent], *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*) held that this jury trial right is not merely a state law entitlement, but is constitutionally required for all aggravating facts, other than a prior conviction, relied upon to justify an upper term sentence." (*Wiley, supra*, 17 Cal.5th at p. 1078.)

Although the United States Supreme Court has long recognized an exception to the federal constitution jury trial right for "the fact of a prior conviction" (*Apprendi, supra*, 530 U.S. at p. 490; see also *Almendarez-Torres v. United States* (1998) 523 U.S. 224, 243–244, 247), and state law likewise has a prior conviction exception (Pen. Code, § 1170, subd. (b)(3)), the scope of those exceptions only recently became more clear. Specifically, in *Erlinger*, the United States Supreme Court confirmed the exception is a "'narrow'" one which allows a judge to "'do no more . . . than determine what crime, with what elements, the defendant was convicted of.'" (*Erlinger, supra*, 602 U.S. at p. 838.) And, even more recently, the California Supreme Court interpreted the state statutory exception to have the same limited scope. (*Wiley, supra*, 17 Cal.5th at p. 1086.)

15

It is an error of constitutional dimension "when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established." (*Lynch, supra*, 16 Cal.5th at p. 768.) Thus, when a defendant is deprived of a jury trial on any aggravating fact used to justify an upper term sentence, an appellate court evaluates prejudice using the standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18. (*Lynch*, at p. 768; *Wiley, supra*, 17 Cal.5th at p. 1087.) "Under that standard, 'a sentence . . . must be reversed and remanded unless the reviewing court concludes beyond a reasonable doubt that a jury, applying that same standard, would have found true all of the aggravating facts upon which the court relied to conclude the upper term was justified, or that those facts were otherwise proved true in compliance with the current statute.' [Citations.] Lack of a jury trial is not harmless under *Chapman* if 'the record contains evidence that could rationally lead to a contrary finding' with respect to the aggravating fact at issue." (*Wiley*, at p. 1087.)

*B. Analysis*

We review each aggravating factor relied on by the trial court, recognizing that prejudice as to any one of them requires reversal for further proceedings.

The first factor concerned the victim's particular vulnerability. (Cal. Rules of Court, rule 4.421(a)(3).) In this context, "a 'particularly vulnerable' victim is one who is vulnerable 'in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.'" (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321.) Brown was convicted of rape of an unconscious person. All unconscious

16

rape victims are particularly vulnerable, so the question is whether other characteristics or circumstances made L.L. particularly vulnerable. On one hand, for example, there was evidence Brown encountered L.L. as she walked on the side of the road in the middle of the night, she was intoxicated, and she became more isolated once in his truck. On the other hand, for example, there was evidence L.L. was on a main road where there was more light than on adjacent smaller streets, L.L. was coherent enough to recall details of what took place before and after the rape, and she was able to employ hostage related training she received from the Federal Bureau of Prisons. On such a record, we cannot conclude beyond a reasonable doubt that a jury would have found the first aggravating circumstance true beyond a reasonable doubt.

The same is true for the second factor, that the offense was carried out with planning, sophistication, and professionalism. (Cal. Rules of Court, rule 4.421(a)(8).) In the videotaped interview played to the jury Brown stated that he was out on the night in question, as he fairly often was, looking for a woman with whom he could have sexual intercourse. This evidenced some level of planning. However, there was evidence he was interested in consensual relations, he stopped in the middle of a main street to pick up L.L., he had sexual intercourse with her behind what he thought was a police station, and he planned to reengage with her after stopping at a gas station where he left her alone with the doors of the truck unlocked. A rational juror could find the latter two pieces of evidence point to a lack of sophistication and professionalism. And, notably, the jury acquitted Brown of kidnapping with an intent to commit rape, seemingly indicating it concluded Brown did not plan to rape her. Given the evidence, and the subjective nature of the inquiry involved in evaluating this factor, a rational jury could have

17

disagreed about whether the rape was planned and accomplished with sophistication and professionalism.

As for the third factor, whether Brown engaged in violent conduct which indicated a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)), we cannot be confident how a jury would have assessed the relevant facts. L.L. testified Brown was "very gentle," he did not sit her down in his truck forcefully, and the only force he used was a "very quick motion" to put her legs into the truck. There was no other evidence tending to show force by Brown. Given the evidence, and the vague and highly subjective nature of the terms "violence" and "serious danger," we cannot conclude beyond a reasonable doubt a rational jury would have found this aggravating factor true beyond a reasonable doubt. (See *Lynch, supra*, 16 Cal.5th at p. 775.)

Last, we consider the factor involving whether Brown had numerous prior convictions and whether they were of increasing seriousness. (Cal. Rules of Court, rule 4.421(b)(2).) Because a determination on this factor involves a comparative and qualitative evaluation of past convictions, it is generally "'"difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court."'" (*Wiley, supra*, 17 Cal.5th at p. 1090.) Such is the case here where it appears Brown has a mixture of felony and misdemeanor convictions, with many convictions dating back more

18

than a decade before the offenses charged in this case, and with the felony convictions occurring sporadically over the course of thirteen years.[2]

"Because we cannot find the omission of a jury trial harmless beyond a reasonable doubt as to *every* aggravating fact relied upon by the trial court to impose an upper term, [Brown's] sentence must be reversed." (*Lynch, supra*, 16 Cal.5th at pp. 775–776.) We remand the matter and give the People an opportunity to retry the aggravating facts. (See *id*. at pp. 776–778.)

DISPOSITION

We vacate Brown's sentence and remand the matter to give the People an opportunity to try the aggravating circumstances in accordance with constitutional and statutory law. In all other respects, we affirm the judgment.

DELANEY, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

GOODING, J.

---

[2] It appears from the record the trial court may have only used a list of past convictions provided in a probation report to render its finding concerning past convictions. Thus, the Attorney General's attempt to save the court's finding in this regard via the statutory exception that allows a court to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury" is unavailing. (See Pen. Code, § 1170, subd. (b)(3).)