Filed 12/18/25  P. v. Jevarian CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SUSAN BURNHAM JEVARIAN,<br><br>    Defendant and Appellant. | A170585<br><br>(Napa County Super. Ct.<br> No. 22CR001698) |

Susan Burnham Jevarian appeals from a judgment sentencing her to six years in state prison after she pled "open" to the court, admitting guilt for felony gross vehicular manslaughter, driving under the influence causing injury, and driving with a blood alcohol level of 0.08 percent causing injury, as well as misdemeanor battery upon a nurse and multiple enhancements. Jevarian contends that the trial court:  (1) abused its discretion in denying her probation by inappropriately considering the seriousness of the crimes and vulnerability of the victims and in failing to adequately consider Jevarian's childhood trauma; (2) erred by failing to apply the low term sentencing presumption pursuant to Penal Code[1] section 1170, subdivision (b)(6); and (3) erred in considering the victims to be "particularly vulnerable"

---

[1] Further undesignated statutory references are to the Penal Code.

1

as a circumstance in aggravation under California Rules of Court, rule[2] 4.421(a)(3), and sentencing her to the middle term. Jevarian further contends that the cumulative impact of these errors requires remand for resentencing. We disagree and affirm.

## BACKGROUND[3]

On the evening of July 23, 2022, the now-deceased Amanda Peters invited her childhood friend Jevarian to come to her house in Sonoma to drink alcohol. Peters was 21 years old, and Jevarian was 20. Jevarian drove over in her burgundy Cadillac; Peters's friend and neighbor saw Jevarian arrive around 7:00 p.m. and retrieve a bottle of Patron tequila from her trunk before entering the house. In her 2024 statement to the probation department made in advance of sentencing, Jevarian represented that while at the house, she and Peters drank several shots of whiskey and tequila and smoked marijuana.[4] Jevarian denied bringing any liquor to the house but explained she would often binge drink and, because she was only a "few

---

[2] Further undesignated rule references are to the California Rules of Court.

[3] Consistent with the appellate briefing, the facts are drawn from the Napa County probation officer's report and recommendation prepared in advance of sentencing and dated April 15, 2024.

[4] The morning after the accident, a second neighbor came over to feed Peters's animals and observed a bottle of tequila and a bottle of whiskey in the living room. "[T]he whiskey was about half full and the tequila bottle was almost empty with maybe one or two shots left in it. There were shot glasses and jar of pickles on the coffee table next to the bottles. . . . [T]here was small jar of marijuana on a side table in the living room and he saw a marijuana bong across the room." According to the first neighbor, Peters "would do a thing" called " 'Pickle Back' " and described it as "chasing shot of alcohol with shot of pickle juice."

months shy of the legal drinking age," she would " 'go all out' to increase her tolerance for alcohol in preparation for her 21st birthday."

Jevarian represented that her memory of the evening was "inconsistent" and could not recall what led Peters and her to leave the house. Jevarian stated that Peters wanted to get her tongue pierced; Jevarian may have recommended the Galaxy Smoke Shop in Napa because she had received piercings there before, but she did not recall saying they should go that evening. Jevarian did not remember leaving the house but drove because Peters did not have a car. A worker at the smoke shop confirmed Jevarian and Peters arrived approximately 8:30 p.m. and received $200 worth of piercings; he believed they were "impaired" but did not smell the odor of alcohol on either of them.

Jevarian told probation that, after she and Peters left the smoke shop, she had intended to drive back to Sonoma so drove to State Route 29 via Imola Avenue. Jevarian "was unaware she had entered the highway going the wrong way," and only remembered "laying her head back," looking up and seeing " 'a streetlight and the Imola sign' " pass over the vehicle. Soon after, Peters "looked at her and screamed, 'Suzie!' " Jevarian said it was " 'lights out' " after that and her next memory was in the hospital.

A witness who called 911 after avoiding a collision reported that he had been traveling northbound in the number two lane of State Route 29 and saw the accident. He observed a Cadillac, with its headlights on, travel the wrong way on the off-ramp and into the number one lane. He estimated that the Cadillac was "traveling quickly, approximately 50-60" miles per hour. He saw a Toyota swerve toward the left in an effort to avoid crashing into the Cadillac and a Tesla ahead of him swerve to the right, the same direction he swerved.

3

Another witness traveling northbound in the number one lane also observed vehicles swerving on the roadway to avoid a "vehicle approaching wrong way approximately 30 feet away, traveling approximately 50" miles per hour.  He swerved left into the median and the vehicle passed by him.

At approximately 10:13 p.m., California Highway Patrol officers responded to a head-on collision on northbound State Route 29.  Jevarian's Cadillac had collided with two vehicles:  the Toyota Corolla driven and solely occupied by Jose Puebla and the Tesla driven by Dennis Totah with three passengers in the vehicle.

Puebla explained in his statement to responding police officers that he had been driving northbound on Route 29 in the number one lane approximately 65 to 70 miles per hour.  He observed headlights approaching him quickly, was struck, and swerved to the left; his vehicle came to a stop in the center median.  Puebla's car sustained serious damage, which included a "broken windshield, detached headlights, detached front bumper, crumpled hood, crumpled right fender, and torn front, right door."  He was assisted out of his vehicle and had "suffered lacerations to his arms and complained of pain to his neck and chest."  Puebla was transported to the hospital by ambulance; no fractures were found, but he was in pain and missed a week of work.

In his statement to police officers that night, Totah said he had been driving north in the number two lane approximately 65 to 70 miles per hour when he observed the Cadillac approaching and traveling between the number one and two lanes.  He saw the Cadillac crash into the passenger side of the Toyota, which propelled the Cadillac into the number two lane immediately in front of his Tesla.  Totah attempted to brake and swerved to the right but was unable to avoid crashing into the Cadillac.  The Tesla went

4

off the roadway and down an embankment; all the airbags deployed, and it sustained major crash-related damage, including a "broken front bumper, crumpled hood, detached front headlights, crumpled left and right-side fenders."

Totah and the passengers crawled out of the Tesla and awaited emergency personnel. All four complained of pain but declined medical treatment at the scene, instead seeking treatment for their injuries in the following days. Totah suffered a bruised wrist and had lower back pain requiring chiropractic treatment. The passengers sought treatment for physical pain, bruising, and soft tissue injuries; one passenger sought therapy for the "emotional trauma suffered from this incident," and another passenger missed work and "has been suffering from paranoia ever since the collision and has a very hard time riding [as a] passenger in a car now, especially at night."

Jevarian's Cadillac also sustained "major crash damage" as a result of the collisions.[5] Jevarian had been ejected from the vehicle and was found lying face down on the highway in the number one lane. Arriving officers observed that she was "injured, sobbing, visibly shaken, and her speech was slurred." At the scene, Jevarian admitted to driving her vehicle but could not recall being in the car or with anyone. In a California Highway Patrol

---

[5] The damage included a "broken windshield, crumpled hood, broken front bumper, detached right headlight, shredded right fender, crumpled passenger side door, dented roof, partially detached driver side door, crumpled left rear half, collapsed left rear wheel, and broken rear bumper." A later-conducted vehicle mechanical inspection determined "the contact damage occurred to the front bumper, hood, passenger side door and fender. Contact damage was also noted on the driver side quarter panel, wheel, roof, and frame. The entire front end was pushed in and to the passenger side of the vehicle and the entire rear of the vehicle was pushed in toward the passenger side of the vehicle."

helicopter on the way to the hospital, Jevarian told personnel that she "consumed six to seven shots of alcohol."  When told she had been involved in a collision, Jevarian stated, " 'Oh my god, why would anyone let me drive?' "  Jevarian's injuries included "bruising along her left shoulder and chest area consistent with a driver side seat belt injury. . . .  [She] was treated for superficial head injuries to include facial lacerations and abrasions with no broken bones or fractures."

Peters was found trapped inside the Cadillac, extracted, and taken to the hospital by ambulance, having sustained major injuries including: "fractures to her upper extremities and rib cage, facial lacerations and contusions to her upper body, . . . a collapsed lung and major lacerations to her spleen and liver. . . .  [H]er brain had swelled due to having shifted from center."  Peters died three days later as a result of her injuries.

Officers at the scene observed several containers of Modelo beer lying on the roadway and adjacent to the Cadillac, but it was unclear if they had been empty or full before the collision.  In the Cadillac, they located two vape pens, cartridges with marijuana leaves on them, a glass smoking pipe with marijuana residue, and a torn piece of a cardboard Modelo beer container on the passenger seat.

At the hospital, officers attempted to question Jevarian, who then said that she "had been drinking tequila and rum and believed she had consumed two shots of each" but was "in and out of consciousness."  Due to her medical condition, the officers were unable to perform any field sobriety tests or obtain Jevarian's clear consent to a blood alcohol test, so they secured a warrant for a nonconsensual blood draw.

A little after 2:00 a.m., Jevarian regained consciousness and initially declined to talk to the officers, but later asked, " 'Am I, like, going to jail.' "

The officers explained that she had been involved in a car collision that she had caused, "due to being under the influence of alcohol and had caused multiple injuries." Jevarian responded that she was "very, very against that shit." Then, Jevarian became "increasingly agitated." She started crying "uncontrollably" and began screaming and bemoaning that she would be going to jail. When the blood draw technician arrived around 2:13 a.m., Jevarian directed her verbal aggression toward the officers. After the blood sample was taken, Jevarian continued screaming loudly while getting up from the bed and began slamming her head on the left side rail. Officers grabbed her, and a nurse in the room, Joe Parker, requested Jevarian lay down. Jevarian refused to comply and began flailing and kicking her legs. When Parker assisted officers attempting to hold Jevarian against the bed, Jevarian kicked and tried to bite him.

The results of Jevarian's blood draw showed her blood alcohol content to be 0.17 percent; her blood sample also contained cannabis and ketamine.[6]

On August 3, 2022, Jevarian was charged by criminal complaint with felony gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 1); felony driving under the influence causing injury (Veh. Code, § 23153, subd. (a); count 2); felony driving with a blood alcohol level of 0.08 percent causing injury (Veh. Code, § 23153, subd. (b); count 3); and misdemeanor battery upon a doctor or nurse (§ 243, subd. (b); count 4). Jevarian was also charged with three special allegations: great bodily injury (§ 12022.7, subd. (a); counts 2 & 3); excess blood alcohol (Veh. Code, § 23578; counts 1 & 2); and bodily injury to more than one victim (Veh. Code, § 23558; counts 2 & 3).

---

[6] As noted in her sentencing brief, Jevarian had been given ketamine at the hospital, approximately three hours before the blood draw.

7

On the date scheduled for the preliminary hearing, February 8, 2024, Jevarian agreed to an "open plea" and pled guilty to all four counts and admitted the three special allegations. The parties stipulated there was a factual basis for the plea. Jevarian waived her right to be sentenced by the same judge who took her plea, and the matter was scheduled for sentencing before a different judge.[7]

Prior to sentencing, the probation department submitted a presentence report recommending probation be denied. The People's sentencing brief requested Jevarian be sentenced to the midterm of six years in state prison for the gross vehicular manslaughter (count 1), with time for the remaining counts and allegations being run concurrently if not stayed.[8] Jevarian's sentencing brief and statement of mitigation requested probation because Jevarian's extensive childhood trauma, which included physical, emotional, and sexual abuse beginning as a baby and subsequent mental health diagnoses were a significant factor in her decision to drink and drive.[9]

At the sentencing hearing held on April 15, 2024, the court stated it had read the probation report and sentencing briefs, including their exhibits, and had considered the photographs of the collision, Jevarian's written and

---

[7] *People v. Arbuckle* (1978) 22 Cal.3d 749, 756–757.

[8] The People quoted rule 4.420, which includes the low term presumption pursuant to section 1170, subdivision (b)(1), and stated "the court must determine the appropriate term between the lower and middle terms of imprisonment" but did not make specific argument concerning Jevarian's childhood trauma. Instead, the People wrote, "the court is not required to impose the low term based on [Jevarian's] age."

[9] Jevarian's sentencing brief did not cite section 1170 or argue that her childhood trauma triggered the low term presumption; rather, she argued that her childhood trauma should be a mitigating factor in favor of probation (see rule 4.414(a)(7)) and to be generally considered. (See rule 4.423(b)(4).)

8

oral statements to the court, the letters that Jevarian wrote to the victims and their families, and the victim impact statements (written and orally presented in court). The court discussed each probation factor set forth in rule 4.414 before stating it "cannot in any way justify a probation sentence in this case." The court noted Jevarian's "rough upbringing" but found Peters "was extremely vulnerable as she was the passenger in this car" and sentenced Jevarian to the midterm of six years for the gross vehicular manslaughter (count 1), two years for driving under the influence with injury (count 2) stayed pursuant to section 654,[10] the midterm of two years for driving with a blood alcohol level above 0.08 percent (count 3) to be served concurrently with count 1, and three one-year terms also to be served concurrently with count 1 for the Vehicle Code section 23558 enhancements. The court further stated Jevarian "may participate in a counseling or education program having a substance abuse component while imprisoned," and ordered her to pay a court assessment fee, a DUI fine, and restitution fund fine, and restitution in amounts to be determined for all of the victims. Jevarian, who had been released on bail in 2022, was remanded to the custody of the sheriff.

On April 25, the court held a further hearing to "Clarify [the] Sentence" "based upon my not making very clear what was happening with the special allegation of great bodily injury, Penal Code 12022.7 subsection A" and to address the time that "still needs to be imposed on count 2, but then stayed pursuant to 654 along with the GBI allegation." Defense counsel also "invite[d] the court to reconsider the sentence." The court declined to make

---

[10] Section 654, subdivision (a) prohibits the imposition of multiple punishments for "an act or omission that is punishable in different ways by different provisions of law . . . ."

any sentence modifications but clarified that it had imposed the midterm of six years for count 1 and the midterm of two years for count 2, but stayed the sentence on count 2 pursuant to section 654. For count 3, the court imposed the midterm of two years to run concurrently with count 1. Considering Jevarian's age, the court dismissed "in the interest of justice and pursuant to Penal Code 1385" the special allegations for blood alcohol in excess of 0.15 percent (Veh. Code, § 23578) and great bodily injury (§ 12022.7). The court also ordered the three years associated with the multi-victim special allegation (Veh. Code, § 23558) to run concurrently with count 1. Last, the court confirmed that it had already ordered restitution.

Jevarian timely appeals.

## DISCUSSION

Jevarian articulates four grounds for her appeal: (1) the trial court abused its discretion in denying her request for probation; (2) the trial court "was unaware" of its obligation to apply and failed to apply the low term presumption pursuant to section 1170, subdivision (b)(6); (3) in sentencing her to the middle rather than low term, the trial court erred in relying on the particular vulnerability of the victims as an aggravating circumstance under rule 4.421(a)(3); and (4) the cumulative impact of the trial court's errors requires remand for resentencing. We address each ground in turn.

### I. *Denial of Probation*

Jevarian contends the trial court abused its discretion by denying her request for probation because the court improperly considered the seriousness of the crime and the vulnerability of the victim (see rule

10

4.414(a)(1), (3)), while failing to consider her childhood trauma (see rule 4.424(a)(7)). We disagree.

## A. Standard of Review

" 'A judgment or order of the lower court is *presumed correct. . . .* [E]rror must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) This general rule applies with equal force to sentencing decisions. (See *People v. Carmony* (2004) 33 Cal.4th 367, 378.)

In sentencing, "Probation is an act of leniency, not a matter of right." (*People v. Walmsley* (1985) 168 Cal.App.3d 636, 638, disapproved on another ground in *People v. LaFantasie* (1986) 178 Cal.App.3d 758, 763–764.) "A trial court has broad discretion to determine whether a defendant is suitable for probation. [Citation.] . . . An appellant bears a heavy burden when attempting to show an abuse of such discretion. [Citation.] To establish abuse, the defendant must show that, under all the circumstances, the denial of probation was arbitrary, capricious or exceeded the bounds of reason. [Citation.]" (*People v. Bradley* (2012) 208 Cal.App.4th 64, 89.) " ' "In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony, supra*, 33 Cal.4th at pp. 376–377.)

Rule 4.414 lists aggravating and mitigating factors that the trial court can consider in deciding whether to grant probation. Rule 4.414(a)(1) expressly authorizes consideration of the "nature, seriousness, and circumstances of the crime as compared to other instances of the same crime," and rule 4.414(a)(3) authorizes the court to consider the "vulnerability

11

of the victim" in its decision to grant or deny probation. " ' "Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154.) A single aggravating factor is sufficient to justify the denial of probation. (See *People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1158.) The trial court may consider additional criteria not listed in the rules, provided those criteria are reasonably related to that decision and they are stated on the record by the sentencing judge. (Rule 4.408(a).)

## B. Nature, Seriousness, and Circumstances of the Crime

Jevarian asserts the trial court abused its discretion in relying on the nature, seriousness, and circumstances of the crime as a basis for denying probation because, "Nothing in the record supports a finding that [Jevarian's] offense was significantly more serious or egregious than other instances of the same crime." She maintains that "the fact that a death occurred . . . [cannot] serve as an appropriate basis for denying probation" because it is "an element of [the] crime." She argues that the court's comment, "[a]nd we know that this is -- can't get much more serious when someone's killed" means the court improperly considered Peters's death as a factor in aggravation when the death was an essential element of count 1.

Considering "other instances of the same crime," Jevarian cites the Court of Appeal's affirmance of a denial of probation in the gross vehicular manslaughter case of *People v. Weaver* (2007) 149 Cal.App.4th 1301 (*Weaver*) overruled on another ground in *People v. Cook* (2015) 60 Cal.4th 922, due to its "horrific nature," which bore "significant differences" from the instant case. Jevarian instead compares her situation to the reversal in *People v. McNiece* (1986) 181 Cal.App.3d 1048, 1060 (*McNiece*), disapproved on another ground in *People v. McFarland* (1989) 47 Cal.3d 798, 805.

In *Weaver*, the defendant drove at 1:00 a.m. in "the opposite direction of oncoming traffic . . . at a high rate of speed," estimated at different times to be between 80 and 100 miles per hour. (*Weaver*, *supra*, 149 Cal.App.4th at p. 1314, fn. 13.) She did not have her headlights on, and, before the fatal crash, she caused one accident and almost caused another. (*Id.* at pp. 1307–1308.) The defendant had a blood alcohol content of 0.151 percent, and she tested positive for cocaine. (*Id.* at p. 1308.)

In *McNiece*, the defendant drove down a street around midnight, traveling approximately 10 to 20 miles per hour above the speed limit. (*McNiece*, *supra*, 181 Cal.App.3d at p. 1054.) The defendant "failed to slow down or stop at the stop sign," and when he entered the intersection, he struck another vehicle, killing one occupant and "seriously" injuring another. (*Ibid.*) The defendant's blood test taken an hour after the accident showed a blood alcohol content of 0.155 percent. (*Ibid.*)

Contrary to Jevarian's assertion, the seriousness of this case exceeds that of *McNeice* and closely parallels *Weaver*. As in *Weaver*, Jevarian was driving down the wrong side of a highway late at night, here, around 10:13 p.m. (*Weaver*, *supra*, 149 Cal.App.4th at pp. 1308, 1314.) In an area she was seemingly familiar with, Jevarian used an off-ramp to enter a divided highway in the wrong direction, where she was estimated to be driving approximately 50 to 60 miles per hour. Jevarian hit one car head-on, causing substantial damage and injury, requiring the driver to be taken to the hospital. She hit that first car with such force that her vehicle was propelled into a second vehicle, forcing it off the road and down an embankment, causing substantial damage to the vehicle and injuring its four occupants. According to her own admissions, Jevarian, who was not yet 21 and "would 'go all out' to increase her tolerance for alcohol in preparation for

13

her 21st birthday" had already "consumed six to seven shots of alcohol" when she sat behind the wheel. Witness statements suggest that Jevarian and Peters consumed whiskey, tequila, and marijuana before the accident, and empty beer containers and marijuana-laced vape pens were found in Jevarian's vehicle. The results of Jevarian's blood draw taken approximately four hours after the accident showed the presence of cannabis and a blood alcohol level of 0.17 percent, over twice the legal limit. Accordingly, "The trial court implicitly concluded, and we cannot presume otherwise, that 'other instances' of section 191.5, subdivision (a) offenses do not involve the same egregious circumstances as in this case." (*Weaver*, *supra*, 149 Cal.App.4th at p. 1317.)

Jevarian's complaint of error in the court's comment that an offense "can't get much more serious when someone's killed" is similarly misplaced. Although Jevarian is correct that the court may not consider an element of the crime as a factor in denying probation (see, e.g., *People v. Parrott* (1986) 179 Cal.App.3d 1119, 1125 ["if an element of the crime could be used by the court to deny probation, the court would in effect be finding that probation ineligibility exists as the result of the commission of a crime, even if such designation was not made by the Legislature"]), Jevarian's argument ignores the fact that Jevarian pled guilty to three additional crimes in which Peters's death was not an element of the offenses and therefore could be appropriately considered as evidence of seriousness. In addition, the court's statements at sentencing indicate a consideration of more than death, specifically Jevarian's "actions have caused the greatest injury that there can be by the fatality to [Peters] but also to her mother, to her brother, her friends, employer, family, you know. And that pain just never goes away. . . . [¶] . . . . The emotional injury is unimaginable." The record evinces no error.

## C. Vulnerability of Victims

Next, Jevarian contends that the trial court abused its discretion when it "ignored the circumstances leading to the accident" and considered Peters's vulnerability as a victim in denying probation. Jevarian argues that Peters was not a more vulnerable victim because she "voluntarily drank with [Jevarian] and voluntarily got into the car [she] was driving on two occasions that night." Jevarian repeats her argument before the trial court that because Peters "was involved in the decisions that cost her life" and had "both advance warning of the dangers related to drinking and driving and the ability to avoid that danger," Peters was not more vulnerable than any other victim.

She relies on *People v. Piceno* (1987) 195 Cal.App.3d 1353, 1358 (*Piceno*), for the principle that because the "element of vulnerability is inherent in the very crime of vehicular manslaughter caused by a driver under the influence of alcohol . . . . [Citation.] [D]runk driving victims should not be considered more vulnerable than victims in other cases." (See also *People v. Bloom* (1983) 142 Cal.App.3d 310, 322 (*Bloom*).) Jevarian again points to *Weaver*, which generally disagreed with *Piceno* but distinguished victims who have "at least some advance notice or warning of the imminent risk posed . . . should be considered less vulnerable." (*Weaver*, *supra*, 149 Cal.App.4th at pp. 1314–1316; see also *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1182 [holding that "a victim of gross vehicular manslaughter who 'has absolutely no advance warning or ability to attempt to avoid' a car that crashes into his or her vehicle may be characterized as a 'particularly vulnerable' victim"].)

But Jevarian's argument parses the court's words too narrowly and ignores the other five victims and their vulnerability. At sentencing, the

15

court did find that "Peters was extremely vulnerable as she was the passenger in this car. Once you took that wrong turn, there was nothing she could do. And according to you, I think she screamed 'Suzie' when she saw the lights coming and screamed it pretty loud, and then that was it." That language appropriately mirrors *Weaver*'s determination that a vulnerable victim is one who has "absolutely no advance warning or ability to attempt to avoid" the crash and is consistent with even *Piceno*'s acknowledgement that " 'we can visualize extraordinary situations in which a drunk driving victim might be considered to be "particularly vulnerable." ' " (*Piceno*, *supra*, 195 Cal.App.3d at p. 1358.)

Notably, the sentencing court also later explained: "I understand your counsel's argument that . . . the fact that the victim in this case did get into the car and, most likely, was intoxicated as well as you . . . besides the fact that she died, there were five other people that were injured, and they have no idea what was coming." This statement shows that, regardless of whether or not Peters's "choice" to ride with her intoxicated friend made her less vulnerable, the court also considered the plight of the five other people injured when Jevarian caused the crashes of two separate vehicles, and none of those victims had advance warning or the ability to avoid the collisions, though they tried.

Based on our review of the record, we conclude there is sufficient evidence supporting the trial court's findings that all six people injured, including Peters, were vulnerable victims of Jevarian's criminal behavior. (Rule 4.414(a)(3).) Before leaving Peters's home, the underage Jevarian had, per her own admission, consumed multiple shots of whiskey and tequila and had smoked marijuana. Immediately after the accident, Jevarian acknowledged her intoxication, exclaiming, "Why would anyone let me

16

drive?" Yet Jevarian had still decided to drive a motor vehicle. Despite growing up in the area and visiting the smoke shop before, she drove "the wrong way on the off-ramp" before crossing into the number one lane of the highway that separated north and southbound traffic with a median, and drove at a speed of approximately 50 to 60 miles per hour directly into oncoming traffic. Even as Jevarian was "laying her head back," as the driver she was the person in complete control of Peters's safety. Peters, whose judgment was likely impaired by her own admitted consumption of alcohol, did not have a car and seemingly trusted Jevarian, her childhood friend, to ride back to Sonoma, when she got into the Cadillac after leaving the smoke shop. Once a passenger in Jevarian's car, Peters did not have any "advance warning or ability to avoid" the accident. (*Weaver*, *supra*, 149 Cal.App.4th at p. 1316.)

In addition, the other five victims had absolutely no knowledge of Jevarian's level of intoxication and bear no fault in the accidents. The cars driven by Puebla and Totah were both traveling in the correct direction. Puebla was driving northbound approximately 65 to 70 miles per hour when he "observed headlights approaching him quickly in the number one lane." He was struck, and the vehicle came to a stop in the center median. Similarly, Totah was driving northbound at 65 to 70 miles per hour when he saw Puebla's brake lights "ahead and to the left of him just before the Cadillac crashed into the passenger side of the Toyota." The Cadillac was propelled sideways into the number two lane right in front of Totah; although he applied the brakes and swerved to the right, he was "unable to avoid crashing into the left, rear side of the Cadillac." Totah's car then went off the roadway and down the embankment. Aside from the brief moment Totah observed Puebla and Jevarian's collision, the drivers of the other two vehicles

and Totah's passengers did not have "advance warning or ability to avoid [her] oncoming car" as they lawfully drove on the correct side of the highway. (*Weaver*, *supra*, 149 Cal.App.4th at p. 1316.) The trial court did not abuse its discretion by relying on the vulnerability of the victims as a factor in denying probation.

## D. Childhood Trauma as a Mitigating Factor

Jevarian also contends that the trial court's denial of probation was an abuse of discretion because the court failed to properly consider her childhood trauma as a factor in mitigation, citing rule 4.414(a)(7) (whether the "crime was committed because of an unusual circumstance . . . which is unlikely to recur") and rule 4.423(b)(3) (the "defendant experienced . . . childhood trauma . . . and it was a factor in the commission of the crime") and (b)(4) (the "commission of the current offense is connected to the defendant's prior victimization or childhood trauma"). Jevarian points to the court's discussion of the probation factors, arguing that because the court did not specifically mention her childhood trauma, the court erroneously failed to " 'consider and appreciate such evidence to have appreciable mitigating weight.' " We disagree.

Prior to the sentencing hearing, Jevarian filed a 23-page sentencing brief with 128 pages of exhibits. The submission is almost completely devoted to detailing Jevarian's tragic upbringing, which included physical and sexual abuse and trafficking by her biological parents and others since her infancy, her ensuing mental health issues (by "age six [Jevarian] was profoundly damaged"), and substance abuse (she "began using drugs and alcohol at age 12 and had become an addict by the time she was 13"). Most of the supporting exhibits detail Jevarian's mental health history, which includes diagnoses for depression and posttraumatic stress disorder and

18

periods of self-harm. Exhibit 11 is a report prepared by Dr. Kevin Kelly, a licensed psychologist retained by Jevarian's attorney to conduct an "Evaluation Confidential to Defense" on March 15, 2023, which concluded, "On one hand, [Jevarian's] acts reflect the immaturity and poor judgment possible for some persons of age 20, and, in Ms. Jevarian's case, her behavior also reflects immaturity and poor judgment that was in consequence to impaired psychological development due to depression and early traumas." Further connecting Jevarian's upbringing to the convicted offenses, her counsel asserted that Jevarian's "depression, anxiety, and poly-substance abuse exacerbated her decline even as they kept her from recognizing or addressing it. The progression of her disease led to a serious car accident that killed one of her best friends and injured several others, and Ms. Jevarian takes full responsibility for her actions and for her failures to act."

Jevarian's attorney repeated these arguments at the sentencing hearing: "I'm not claiming on her behalf that her highly traumatic childhood or the conditions that arose from that highly traumatic childhood are an excuse," but the "commission of the current offense is directly related to her prior victimization. That's a mitigating factor." (See rules 4.414(a)(7) & 4.423(b)(3), (4).) The district attorney and probation department appeared to disagree with defense counsel's assertion of a causal connection. In her presentencing memorandum, the district attorney asserted the accident was not an "unusual circumstance unlikely to reoccur" explaining, "It appears substance use and abuse has been an issue for defendant for many years. There is zero evidence before the court that this was one-time binge drinking episode. In fact, the opposite is true. [Jevarian] told Probation that at the time of the offense she was few months shy of her 21st birthday and had been

19

going 'all out' in order to increase her tolerance for alcohol in preparation of her birthday." The probation report also referenced Jevarian's childhood trauma but concluded that rule 4.414(a)(7) did not apply; the probation report did not reference rule 4.423(b)(2) or (b)(3).

At sentencing, the trial court said twice it had read and considered the probation officer's report,[11] the briefing submitted by the parties, and the arguments of counsel. The court also explicitly stated, "I've read the report from Dr. Kelly, reviewed the school records," both of which detailed instances of childhood trauma, and Dr. Kelly's report included the specific conclusion that Jevarian's childhood trauma "was a significant factor in Ms. Jevarian's poor judgment to use alcohol and to drive." In declining to impose probation, the court went on to explain, "I understand that you've had a rough upbringing, but your decision to drive that night, you very well knew the consequences of driving and what may happen."

California Rules of Court generally do not require a sentencing judge to state the reasons for denying probation (see rule 4.406.), and relevant factors "will be deemed to have been considered unless the record affirmatively reflects otherwise." (Rule 4.409.) However, here, not only did the trial court specifically reference Jevarian's "rough upbringing" in denying probation, but the fact that the pre-existing record almost entirely focused on Jevarian's childhood trauma renders implausible her current argument that her trauma was erroneously overlooked. (Rule 4.409; see *People v. Torres* (2020) 47 Cal.App.5th 984, 988–989 [an appeal that " ' "merely affords an opportunity for a difference of opinion" ' " does not mean an appellant has shown an abuse of discretion]; see also *Weaver*, *supra*, 149 Cal.App.4th at p. 1318 ["we

---

[11] The court also signed a statement attached to the report that the judge "read and considered" the probation report.

presume the court did, in fact, consider those circumstances even though it did not expressly restate, recite, or otherwise refer to each one"].)  The trial court's consideration and rejection of Jevarian's childhood trauma as a factor in mitigation was not an abuse of discretion.

## II. *Presumptive Low Term Sentence*

We next turn to Jevarian's challenge to the court's imposition of the midterm rather than the low term sentence.  Effective January 1, 2022, Senate Bill No. 567 amended section 1170 to require that a trial court "shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."  (§ 1170, subd. (b)(1); Stats. 2021, ch. 731, § 1.3.)  Paragraph (2) then requires the imposition of the lower term if any one of certain enumerated factors "was a contributing factor in the commission of the offense" unless "the imposition of the lower term would be contrary to the interests of justice."  (§ 1170, subd. (b)(6); Stats. 2021, ch. 731, § 1.3.)  One such factor is a defendant's experience of "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence."  (§ 1170, subd. (b)(6)(A).)  Thus, Senate Bill No. 567 "make[s] the middle term the presumptive sentence" unless aggravating factors admitted or proved beyond a reasonable doubt justify the upper term (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464, disapproved on another ground in *People v. Lynch* (2024) 16 Cal.5th 730, 769), or unless a defendant's prior trauma contributed to the commission of the offense and the court does not find the imposition of the lower term would be contrary to the interests of justice.  (*People v. Salazar* (2023) 15 Cal.5th 416, 423, quoting section 1170, subd. (b)(6).)

Jevarian contends that the trial court erred in failing to apply the low term presumption under section 1170, subdivision (b)(6), which was triggered

by her sentencing brief arguing her childhood trauma contributed to her commission of the offenses. Because "nothing in the record indicates the trial court assessed whether the presumption applied or whether imposing the lower term would be contrary to the interests of justice," Jevarian argues that the midterm sentence imposed was an abuse of discretion requiring remand for resentencing.

In response, the Attorney General argues that Jevarian's claim is forfeited because defense counsel failed to specifically mention the presumptive low term in its sentencing memorandum or at the sentencing hearing and also failed to object to the trial court's sentence on the basis of section 1170(b)(6). Objection is necessary, the Attorney General argues, citing *People v. Scott* (2015) 61 Cal.4th 363, because any failure to make an express finding could have been corrected at the hearing. We agree.[12]

The failure to object before the trial court generally forfeits an issue on appeal, including " ' "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial. ' " (*People v. Scott*, *supra*, 61 Cal.4th at p. 406.) The rationale is that counsel is responsible for " 'understanding, advocating, and clarifying permissible sentencing choices at the hearing. Routine defects

_____

[12] In the alternative, the Attorney General argues that the record shows the trial court was aware of the low term presumption but was not obligated to mention section 1170, subdivision (2) specifically; the judge's reference to Jevarian's "rough upbringing" and additional comments concerning Jevarian's age show the court considered and rejected the low term presumption, which the People had cited in their sentencing brief and referenced at hearing when stating, "I believe it is possible to also get to a six-year term or close to a six-year term if the court feels that it is bound by imposing a mitigated sentence." Because we find the low term presumption argument forfeited, we do not address the Attorney General's alternative argument.

in the court's statement of reasons are easily prevented and corrected if called to the court's attention.' " (*People v. De Soto* (1997) 54 Cal.App.4th 1, 8.) Counsel is obligated to call specific objections to the trial court's attention to allow it to correct any sentencing errors. (*Id.* at pp. 8–9.)

Here, Jevarian had not one, but two opportunities to assert her section 1170 objection: at the initial sentencing hearing on April 15, 2024, and at the clarifying hearing on April 25. Jevarian concedes that she failed to raise a section 1170 objection at either hearing, despite the fact that her 2024 sentencing took place more than two years after section 1170's relevant amendment. However, she maintains that the lower term presumption is not subject to forfeiture; because she made the requisite initial showing that the presumption applied, the trial court was obligated to apply the presumption.

Jevarian acknowledges this court's holding in *People v. Achane* (2023) 92 Cal.App.5th 1037, 1044–1047, which applied the doctrine of forfeiture to a section 1170, subdivision (b)(6) low term presumption claim. (See also *People v. Tilley* (2023) 92 Cal.App.5th 772, 778 [defendant's failure to seek lower term, object to imposition of higher term, or argue mitigating factors under amended § 1170, subd. (b)(6), forfeited claim on appeal].) Jevarian instead asserts she is challenging the trial court's "misapprehension of its sentencing obligations" consistent with *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 994, footnote 8, which declined to apply forfeiture "where the defendant 'does not challenge the manner in which the trial court *exercised* its sentencing discretion but rather its apparent misapprehension of statutory sentencing obligations.' " (*Id.* at p. 994, fn. 8.)

But that distinction does not apply here. Ultimately, Jevarian's claim is no different from that in *Achane* where we explained: "A trial court's decision whether to apply this provision thus depends on both factual

23

determinations and the exercise of discretion.  A sentence imposed without consideration of section 1170, subdivision (b)(6), is not one that 'could not lawfully be imposed under any circumstance in the particular case' [citation] and does not present a question of law that can be corrected ' " 'independent of any factual issues presented by the record at sentencing' " and without "remanding for further findings." ' " (*People v. Achane*, *supra*, 92 Cal.App.5th at p. 1044.)  Indeed, "the remedy for a sentence imposed without consideration of this provision is remand for resentencing."  (*Ibid*.)  Thus, as in *Achane*, Jevarian "cannot escape the consequences" of her failure to object. (*Ibid*.)  Because we conclude the issue is forfeited, we make no determination as to whether the presumption under section 1170, subdivision (b)(6) applies.

### III.  *Particularly Vulnerable Victims Aggravating Circumstance*

Jevarian repeats many of her above arguments in contending that the trial court prejudicially erred in relying on the victims' "particular vulnerability" (rule 4.421(a)(3)), to impose a midterm sentence.

But a trial court's decision to impose a particular sentence is reviewed for abuse of discretion and "will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice." (*People v. Blackwell* (2016) 3 Cal.App.5th 166, 199.)  "In selecting between the middle and lower terms of imprisonment, the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision." (Rule 4.420(d).)  Whether a victim was "particularly vulnerable" is an aggravating circumstance.  (Rule 4.421(a)(3).)  A particularly vulnerable victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases." (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.)  We review the trial court's aggravating

circumstances finding for substantial evidence. (*People v. Morgan* (2024) 103 Cal.App.5th 488, 520, review granted Oct. 2, 2024, S286493, disapproved on other grounds in *People v. Wiley* (2025) 17 Cal.5th 1069.)

At the initial sentencing on April 15, the trial court called Peters "extremely vulnerable" and concluded that the aggravating circumstance applied: "Amanda is no longer here and that she was a passenger; she didn't have control of the vehicle, and you did. Your attorney has said over and over again she got into the vehicle voluntarily. Yes. But you were the one who was driving and it was on you to make the decision not to drive." At the clarifying sentencing hearing on April 25, the court further explained her decision, "So the court imposed the midterm and the reasons I imposed the midterm are for the following: I understand your counsel's argument that based upon the fact of your age, which is a factor to consider as far as imposing the low term, the fact that the victim in this case did get into the car and, most likely, was intoxicated as well as you; and for those reasons the low term may have been imposed. But the reason I didn't impose the [low term[13]] is besides the fact that she died, *there were five other people that were injured, and they had no idea what was coming.* [¶] Puebla . . . was taken to the hospital . . . . [¶] The other four individuals who were injured were not injured as severely, but sometimes the emotional injuries can last longer than the physical injuries. Statements from some of the victims stated how they were afraid to get in the car and how this affects them for years to come; we don't really know." (Italics added.)

Jevarian argues that the trial court erred in relying on victim vulnerability as an aggravating circumstance because, citing *Bloom, Piceno,*

---

[13] The word "midterm" rather than "low term" appears to have been erroneously included in the reporter's transcript.

25

and *McNiece*, discussed above, all victims of gross vehicular manslaughter are vulnerable, thus rule 4.421(a)(3) is inapplicable as a matter of law. But *Bloom* and *McNiece* acknowledge that there may be "extraordinary situations in which a drunk driving victim might be considered to be 'particularly vulnerable.' " (*Bloom*, *supra*, 142 Cal.App.3d at p. 322.) As discussed above, Jevarian overlooks the particular vulnerability of all six victims, as referenced by the court: "there were five other people that were injured, and they had no idea what was coming." (See *Weaver*, *supra*, 149 Cal.App.4th at pp. 1316, 1321 [a victim of gross vehicular manslaughter who "has absolutely no advance warning or ability to attempt to avoid" a car that crashes into his or her vehicle may be characterized as a "particularly vulnerable" victim].) We see no abuse of discretion in the trial court's rejection of Jevarian's argument against vulnerability: " 'Then it was okay that I was driving under the influence because [Peters] knew I was under the influence and she was under the influence, too. And therefore, I'm not really responsible for that.' Well, I don't buy that." The record presents substantial evidence that all six victims had no ability to avoid the accidents caused by Jevarian's misconduct and therefore were particularly vulnerable; accordingly, the court did not abuse its discretion in imposing the midterm. (*Id.* at pp. 1315–1316.)

### IV. *Cumulative Error*

Last, Jevarian asserts that even if the aforementioned asserted errors do not each individually require reversal, there is more than a reasonable probability that she would have received a lesser sentence absent their cumulative effect, thus remand is required.

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) As stated, the trial court did not abuse its

26

discretion in denying Jevarian's request for probation or sentencing her to the midterm, and Jevarian forfeited any challenge to the application of the low term presumption under section 1170, subdivision (b)(6), by not objecting at either of the two sentencing hearings.  As such, there is nothing to cumulate.  (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1094 ["we have found no error to cumulate"]; see also *People v. Linton* (2013) 56 Cal.4th 1146, 1197 [no cumulative error where defendant's claims "were waived, forfeited, invited or . . . meritless"].)

## DISPOSITION

The judgment is affirmed.

DESAUTELS, J.

We concur:

STEWART, P. J.

MILLER, J.

*People v. Jevarian* (A170585)